Roy E. STARK, Petitioner,

v.

TWIN CITY CARPENTERS DISTRICT COUNCIL, and Peter Woida, Respondents.

No. 3–63–Civ. 148.

United States District Court
D. Minnesota,
Third Division.

June 25, 1963.

James C. O'Neill and Bundlie, Kelley & Torrison, St. Paul, Minn., for petitioner.

Erwin Peterson and Willard L. Converse, of Peterson, Bell & Converse, St. Paul, Minn., for respondents.

LARSON, District Judge.

This is a motion to enjoin the enforcement of certain punishment meted out to the petitioner on December 10, 1962, by the respondent Twin City Carpenters District Council. The petitioner, relying on 29 U.S.C. §§ 411(a) (2) and (5), has alleged that he is a member in good standing of Local No. 7 of the Carpenters Union and that at a regular union meeting on or about October 12, 1962, he, referring to a very controversial matter involving the suspension of the junior business agent of Local No. 7, Archie Anderson, stated from the floor of the union meeting that:

"I have heard from a member of Local 1644, and also from some members in our own Local, that the business agent and some members of our Local went over to the District Council and voted against Archie Anderson to expel him. I do not know if this is true or not, but if it is true, then any of you members who have anything against Archie Anderson should get up and say what you have against him out in the open."

The petitioner alleges that the respondent Woida, the senior business agent,

became very enraged at this remark and subsequently filed charges against him, alleging a violation of Section 55, paragraph 5, of the union constitution. This provision states:

"Section 55. Any officer or member found guilty after being charged and tried in accordance with Section 56, for any of the following offenses, may be fined, suspended or expelled only by a majority vote of the * * * delegates to the District Council having jurisdiction of the offense.

\*　　\*　　\*　　\*　　\*　　\*

"(5) Willful slander or libel of an officer or any member of the United Brotherhood."

The petitioner further alleges that he did not receive proper notification of the charges filed against him and that the union trial held on November 26, 1962, was not fairly conducted. The petitioner alleges that he was convicted at said union trial and fined $10; that he expects to be nominated for the office of delegate to the District Council from Local No. 7; and that Section 17 of the Union Constitution provides:

"Any officer or member who has violated the Constitution and laws of the United Brotherhood or any of the trade rules of the local union and/or district council and has been convicted of same shall not be eligible to hold any office in the local union and/or district council, nor shall he act as a delegate to any affiliated body *until expiration of three years from the date of said conviction.*" (Emphasis supplied.)

The respondents' joint answer avers that the petitioner's statement was to the effect that the respondent Woida "was one of the men that kicked Archie Anderson out of our union;" that the respondent Woida jumped to the floor and said that the petitioner was going to have to prove those charges; and that the petitioner received proper notification of his alleged misconduct and a fair trial on the merits.

The petitioner alleges that he has appealed to the General President of the United Brotherhood, that receipt of said appeal was duly acknowledged, that he has not to this date received any notification from the General President of the disposition of his appeal, that four (4) months have elapsed from the date of his appeal or the date of its receipt, and that he has therefore exhausted reasonable hearing procedures within his union. The petitioner concedes there is a question of fact as to the fairness of the procedures involved in his trial, but urges that the right to freedom of speech conferred by Section 101(a) (2) of the LMRDA, 29 U.S.C. § 411(a) (2), deprived the Local of power to try him for slander, citing Salzhandler v. Caputo, 316 F.2d 445 (2d Cir. 1963). The Salzhandler case is precisely in point here, but the respondents have urged that the case was incorrectly decided for a number of reasons.

The plaintiff in Salzhandler accused some of his union officers of improper conduct with respect to union funds and called them such names as "thieves, scabs, robbers, scabby bosses, bums, pimps, f-bums [and] jail birds." Salzhandler was found guilty in a union trial of violating the union's constitution which prohibited:

> " 'conduct unbecoming a member * * *', 'acts detrimental to * * interests of the Brotherhood', 'libeling, slandering * * * fellow members [or] officers of local unions' and 'acts and conduct * * * inconsistent with the duties, obligations and fealty of a member.' "

The Trial Council's punishment prohibited Salzhandler from participating in the affairs of his Local or the District Council for 5 years, including attendance at meetings, voting, having the floor, or being a candidate for any position in any Local Union or in the District Council. Salzhandler then brought an action in Federal District Court where it was held: (1) that the evidence supported the Trial Board's conclusions that Salzhandler's statements were libelous, (2)

that the statements were, in fact, libelous, and (3) that Title I of the LMRDA did not include the right of a union member to libel or slander officers of the union. The Court of Appeals reversed, saying, 316 F.2d at 446:

> "We hold that the LMRDA protects the union member in the exercise of his right to make such charges without reprisal by the union; that any provisions of the union constitution which make such criticism, whether libelous or not, subject to union discipline are unenforceable; and that the Act allows redress for such unlawful treatment."

The Court's rationale is attacked by the respondents here on several grounds.

The idea that union members should enjoy the same freedom of speech without reprisal from their union that ordinary citizens enjoy with respect to the State and Federal government did not suddenly spring into existence in the spring of 1959. In fact, this concept originated nearly twenty years before, and its development has been ably traced in Rothman, Legislative History of the "Bill of Rights" for Union Members, 45 Minn.L.Rev. 199 (1960). Legislation involving the internal affairs of unions was introduced in Congress in 1958, but no action was taken until 1959. At the first of that year the Kennedy-Irvin Bill, S. 1555, was introduced, but it contained no measures protecting the union member's freedom of speech and similar rights. Senator McClellan, who for two years had presided over hearings involving corruption in parts of the labor movement, was deeply concerned over what he considered to be a vital flaw in the Kennedy-Irvin Bill, and so he offered an amendment, S. 1137, which, inter alia, provided for a bill of rights for the union member. After Senator McClellan made an impassioned speech on behalf of this measure, 105 Cong.Rec. 5804–06 (daily ed. April 22, 1959), his amendment was passed by a narrow margin. 105 Cong.Rec. 5827 (daily ed. April 22, 1959). The measures in S. 1137 providing for equal rights, freedom of speech,

and freedom of assembly were drafted in sweeping terms.[1] For reasons adverted to by Senator Clark [2] and Senator Cooper,[3] Senator Kuchel offered an amendment to those provisions, which is reprinted in the margin.[4] The Kuchel amendment, with certain modifications not relevant here, was passed by the Senate, untouched by the draftsman of the Landrum-Griffin bill in the House and enacted into law, insofar as relevant here, as Sections 101(a) (1) and

1. "Sec. 101.(a) (1) EQUAL RIGHTS.— Every member of a labor organization engaged in an industry affecting commerce shall have equal rights and privileges within such organization, including identical voting rights and equal protection of its rules and regulations.

   "(2) FREEDOM OF SPEECH.—Every member of any such labor organization shall have the right to express any views, arguments, or opinions regarding any matter respecting such organization or its officers, agents, or representatives, and to disseminate such views, arguments, or opinions either orally or in printed, graphic, or visual form without being subject to penalty, discipline, or interference of any kind by such organization.

   "(3) FREEDOM OF ASSEMBLY.— Every member of any such labor organization shall have the right to meet and assemble freely with any other members for the purpose of exchanging views and reaching decisions with respect to any matters pertaining to such organization or its officers, agents, or representatives, without being subject to penalty, discipline, or interference of any kind by such organization."

2. "Mr. CLARK. Mr. President, on behalf of the Members of the Senate on this side of the aisle who have participated in the drafting of the amendment, I should like to express our pride in the leadership furnished by the distinguished Senator from California [Mr. KUCHEL]. He has advanced his stature with all reasonable, clear-thinking people in the United States, regardless of party, by the courageous stand he has taken in assuming leadership on the pending amendment. "The amendment does five things, and the most important is that it protects the legitimate rights of the rank-and-file members of unions. It does that without, first, inadequate draftsmanship. The amendment is carefully drawn. Its predecessor was full of loopholes. Second, it does not contain union-busting provisions, as its predecessor did. Third, it does not permit any Communist infiltration into unions. Its predecessor did. Fourth, it takes the Federal bureaucracy out of this bill of rights and leaves its enforcement to union members, aided by the courts.

"It is a good, sound amendment, which properly protects the rights of union members. The bill will be a better measure as a result. I am confident that if the amendment is adopted it will be a provision of which all of us can be proud." 105 Cong.Rec. 6024 (daily ed. April 25, 1959).

3. "Mr. COOPER. * * * "We have presented an amendment which I believe corrects the errors in the first amendment offered by the Senator from Arkansas. Some Senators may believe that the amendment which we offer limits rights or derogates rights afforded by the McClellan amendment. I do not think so. It removes the extremes raised by the amendment of the Senator from Arkansas. It assures clearly the rights of members of a union." 105 Cong.Rec. 6025 (daily ed. April 25, 1959).

4. "SEC. 101(a) (1) EQUAL RIGHTS— Every member of a labor organization engaged in an industry affecting commerce shall have equal rights and privileges within such organization to nominate candidates, to vote in union elections or referendums, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

   "(2) FREEDOM OF SPEECH AND ASSEMBLY.—Every member of any such labor organization shall have the right to meet and assemble freely with other members and to express any views, arguments, or opinions, and to express at union meetings his views, upon candidates in a union election or upon any business properly before the union meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: PROVIDED, That the foregoing is limited so that nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to refrain from conduct that would interfere with its performance of its legal or contractual obligations."

(2) of the LMRDA, 29 U.S.C. §§ 411(a) and (2).[5] The instant case involves only Section 101(a) (2), but the debate on the floor of the Senate can best be understood by reference to the changes in both sections. Comparison of the McClellan and Kuchel measures shows that the latter made three major additions to the former. First, in the Kuchel provision dealing with equal rights within the meeting, those rights are granted "subject to reasonable rules and regulations in such organization's constitution and bylaws." A similar qualifying phrase was added to the freedom of speech measure, also making those rights "subject to the organization's established and reasonable rules pertaining to the conduct of meetings." The McClellan measures had no such qualifying language. Second, the freedom of speech measure was made subject to a proviso allowing adoption and enforcement of "reasonable rules as to the responsibility of every member toward the organization as an institution * * *." Third, the same proviso also allows enforcement of reasonable rules as to the member's refraining from conduct that would interfere with the union's performance of its legal or contractual obligations.

In this case the respondents rely on the second of the previously mentioned additions, the first part of the proviso to Section 101(a) (2), and urge that the trial of the petitioner under Section 55(5) of the union constitution is no more than an enforcement of a reasonable rule dealing with the responsibility of the petitioner toward Local No. 7. The respondents advert to a portion of a statement made by Senator Clark to the effect that the Kuchel amendment did not have any "union busting" provisions, as its predecessor did.[6] This argument can be met by saying that even if the first proviso to Section 101(a) (2) is an anti-"union busting" provision,[7] the words that the petitioner allegedly uttered could not possibly be viewed as "union busting" and he was not tried for violation of any of the union's anti-"union busting" provisions, some of which are reprinted in the margin.[8] The respondents further advert to a colloquy between Senators Curtis and Ku-

5. "(1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

"(2) Freedom of speech and assembly.— Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that

would interfere with its performance of its legal or contractual obligations."

6. See footnote 2, supra.

7. See footnotes 19 and 20, infra.

8. "Section 55 * * *
"(2) Advocating division of the funds of the United Brotherhood or any subordinate body thereof.
"(3) Advocating separation of any subordinate body from the United Brotherhood.
   *       *       *       *       *
"(7) Furnishing to any unauthorized person, without the consent of the Local Union, a list of the membership.
"(8) Divulging to any unauthorized person, the business of any subordinate body without its consent.
"(9) Divulging the quarterly Password for any purpose other than to enter the meeting.
"(10) Working behind a picket line duly authorized by any subordinate body of the United Brotherhood."

chel[9] to support the proposition that Congress intended that unions could impose "reasonable restraints on the right of free speech" through union trials for slander and libel. The question seems to be: Does the first part of the proviso to Section 101(a) (2), the second major addition of the Kuchel amendment, when read with the Kuchel-Curtis colloquy[10] in mind, sustain the union's right to try the petitioner for wilful slander in the circumstances presented here. No testimony has been taken, and so the version of the petitioner's statement set forth in the respondents' pleadings and affidavits is adopted.[11]

■■ The previously phrased question is answered in the negative for a combination of several reasons. First, the limited debate on the portions of the Kuchel amendment relevant here, when viewed in its entirety, does not sustain the inference that there was an express intent that unions would have the power under this proviso to conduct trials for libel and slander. Senator Kuchel read his amendment to the Senate[12] which was shortly followed by the previously mentioned colloquy between Senators Curtis and Kuchel.[13] Senator Clark then made some general remarks mentioned earlier.[14] Senator Lausche then rose to inquire why the absolute rights conferred by the McClellan amendment had been limited by the Kuchel amendment.[15] Senator Cooper assured Senator Lausche

9. "Mr. CURTIS. Why is it that the Senator has taken away from the workers as members of the same organization equal rights in everything?

"Mr. KUCHEL. I would deny that that is what the authors have done or have intended to do.

"To the contrary, Mr. President, it seemed to us that the language in the amendment of the able Senator from Arkansas, as printed on page 5810 of the RECORD, regarding any matter, was too broad, and that there are in this land of ours, for example, reasonable laws governing libel and slander. The rule of reason is what we sought to apply. By the language of our amendment, which is printed beginning on page 5997 of the RECORD, which I read just a few moments ago, we attempt to provide for the rule of reason with reasonable restraints on the right of free speech. To that extent we have changed the language.

"Mr. CURTIS. Is it true that under the Senator's amendment there are some rights which are not granted equally to all members of the union?

"Mr. KUCHEL. That would be true only if one of the courts of the United States, which was called upon to sit in judgment as to whether the rights were violated, determined that it was reasonable on the part of a specific labor organization to make such an excision." 105 Cong.Rec. 6022 (daily ed. April 25, 1959).

10. See footnote 9, supra.

11. A typical affidavit filed by the respondents described the occurrence as follows:

"Your affiant states that at a regular meeting of Local Union 7 held on October 12, 1962, during the regular course of the Union meeting, Brother Roy E. Stark, the petitioner herein made a derogatory statement concerning our Business Agent. Stark's statement was to the effect that our Business Agent was one of the men that kicked Archie Anderson out of our Union. Immediately thereafter Brother Peter Woida jumped to the floor and said that Stark was going to have to prove those charges. Thereafter Stark started to backtrack and made the statement to the effect that he had been told this by some member of another Union that Peter Woida had voted against Anderson down at the Twin City Carpenters District Council meeting." (Affidavit of Paul Winje.)

12. See 105 Cong.Rec. 6021, 6023 (daily ed. April 25, 1959).

13. See footnote 9, supra.

14. See footnote 2, supra.

15. "Mr. LAUSCHE. Mr. President, I should like to discuss the equal rights provision and the free speech provision, and to point out to the Senate that the McClellan amendment guaranteed absolute equality of rights under the rules and regulations of the union. The provision in the substitute does not guarantee absolute equality of rights. No explanation has been given why the substitute provides that the rights shall be limited if the union so desires.

"Second, on the subject of free speech, the McClellan amendment guaranteed the absolute right of free speech. The substitute limits the right of free speech. There can be no denial of the fact that, for some reason, the McClellan amend-

that what the Court has described as the first change was procedural only, that the second and third changes (dealing with the proviso) did not limit "any substantive rights, contemplated and defined in the entire title or otherwise in the bill," and that the purpose of the Kuchel amendment was merely to correct some errors in the McClellan amendment.[16]

ment was diluted to the point that equality of rights have been abbreviated and freedom of speech has been limited. My query of the proponents is why the equality of rights has been limited and why the right of free speech has been abridged. I wish someone would answer that query. 105 Cong.Rec. 6025 (daily ed. April 25, 1959).

16. "Mr. COOPER. * * *
"I address myself to the question asked by the senior Senator from Ohio (Mr. LAUSCHE). He suggested that section 101 limits the right of union members, in comparison with the McClellan amendment. One provision reads 'subject to reasonable rules and regulations in such organization's constitution and bylaws.'
"That is a procedural provision. It deals with the right of a private or a semi-private organization to control its meetings by reasonable rules. But in the view of all of us who propose the amendment, it is not believed that this language on the proviso limits any substantive rights, contemplated and defined in the entire title or otherwise in the bill.
"Mr. President, may I have one more minute?
"Mr. DIRKSEN. Mr. President, I yield the Senator 2 minutes on the bill.
"Mr. COOPER. This will be perhaps my only statement on the amendment. I am one of its cosponsors. When I voted 'aye' on the amendment offered by the Senator from Arkansas (Senator Mc-CLELLAN), I was perfectly aware that the amendment contained some provisions which I believed extreme. Yet, because I believe strongly in the rights involved—the constitutional principles which the McClellan amendment expressed, the rights guaranteed under the Bill of Rights —I considered that these principles overrode any objection I might have to certain provisions, which, in any event, could be corrected.
"We have presented an amendment which I believe corrects the errors in the first amendment offered by the Senator from Arkansas. Some Senators may believe that the amendment which we offer limits rights or derogates rights afforded

In a colloquy which is quite germane to the facts of this case, Senator Goldwater stated that he had "grave misgivings" that union constitutions would be used (as here) to limit criticism of union officers. In rebuttal, Senator Kuchel stated that this was not the intention of his group.[17] If Senator Kuchel's

by the McClellan amendment. I do not think so. It removes the extremes raised by the amendment of the Senator from Arkansas. It assures clearly the rights of members of a union." 105 Cong.Rec. 6025 (daily ed. April 25, 1959).

17. "Mr. GOLDWATER. * * *
"I refer to page 2, paragraph 2: 'Freedom of Speech and Assembly.' I say to the Senator from California that I have grave misgivings as to the proviso clause. I think if it were eliminated, the 'Freedom of Speech and Assembly' paragraph would be perfectly acceptible. It would be in accordance with the McClellan amendment language. The language now reads:
"'PROVIDED, That the foregoing is limited so that nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to refrain from conduct that would interfere with its performance of its legal or contractual obligations.'
"I feel that the use of that language will leave the situation just as it is today. The language of the union constitutions sounds like democratic language, but it is not. We find, for instance, that 74 unions limit member criticism of officers and fellow members, and 15 unions prohibit the issuance of any literature emanating from members unless the consent of the national officers is received.
"If that proviso is retained in the amendment, I say the unions could continue to write into their constitutions language to limit the actions of the membership; they could prevent the members from standing up in a meeting, for example, and saying they object to the union's backing a certain candidate in a political campaign.
"I have two approaches to this matter.
"Mr. KUCHEL. Mr. President, will the Senator yield?
"Mr. GOLDWATER. I yield.
"Mr. KUCHEL. For the sake of the legislative history, I may say there is no intention on the part of the proponents of the amendment to be done that of which

earlier remarks [18] raised some doubt as to the meaning of his amendment, the foregoing reply to Senator Goldwater shows that there was no intention to allow unions to do the sort of thing that has been done here. The Court in Salzhandler described Senator Kuchel's earlier remarks as "ambiguous," 316 F.2d at 450, fn. 8, and that seems to be a fair description of them. Whatever the first proviso to Section 101(a) (2) was intended to mean,[19] it seems fairly clear that Congress did not intend that the sort of statement that the petitioner made here could be made the basis of punishment for slander under the language of that proviso.[20]

■ Doubt as to the matter is quickly resolved by reference to more general considerations implicit in the legislative history of the LMRDA. The interpretation sought here to be given Section 101 (a) (2) in this case is totally inconsistent with the background of the statute and the express purposes which Congress declared the LMRDA to have. As the Court in Salzhandler said, 316 F.2d at 449:

> "The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain."

This is somewhat of an understatement for, as this Court has noted elsewhere,

---

the Senator from Arizona is apprehensive." 105 Cong.Rec. 6026 (daily ed. April 25, 1959).

18. See footnote 9, supra.

19. The nature of the conduct which the union can punish under the provisos to Section 101(a) (2) has been adverted to by Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 834 (1960) states:
   "Section 101(a) (2) carries the legal protection of dissent a step farther by guaranteeing union members freedom of speech both inside and outside union meetings, and also by securing the critics an opportunity to meet for the purpose of organizing their opposition. The latter privilege would seem essential to the formation of effective minorities even though it flies in the face of traditional trade union opposition to any form of caucus or separate assemblage. *However, dissent in a union, like treason within a nation, must be suppressed if the purpose is to destroy the union, encourage a rival, or bring about the violation of legal or contractual obligations.* Section 101(a) (2) contains an exception for these cases." (Emphasis supplied.)
   See also 105 Cong.Rec. 16385 (daily ed. Sept. 3, 1959):
   "First, Section 101(a) (1) and section 101(a) (2) of the conference committee bill deal with equal rights and freedom of speech and assembly of union members. These sections contain limitations to insure the right and authority of unions to adopt reasonable rules to enable them to carry on their business, including the pres-

ervation of order at union meetings and requiring union members to be loyal and responsible to their union's performance of its legal or contractual obligations. Under these provisions, union officers can be sued by a union member who has been ejected from a meeting or who has been disciplined for leading a back-to-work movement in the midst of a strike if this officer's action does not appear to be reasonable in the circumstances to the court."

20. "Defining the limits of this right is difficult, for the words of the qualifying provisos give little guidance in difficult cases. A member who urged a 'wildcat strike' could be expelled by the union for 'conduct that would interfere with its performance of its legal or contractual obligation.' Urging workers to return to work during a strike probably violates 'the responsibility of every member toward the organization as an institution,' but advocating that a strike be called off is probably protected even though it weakens the union's will and ability to resist. Joining or supporting a rival union probably can be punished, but organizing an opposition group to work within the processes of the union is within the protected right. The line is inevitably indistinct, to be picked out by the courts case by case, but *the qualifying provisos were not intended to change the basic guide—the right of freedom of speech and assembly in a democratic society*." (Emphasis supplied.) Summers, American Legislation for Union Democracy, 25 Mod.L.Rev. 273, 286–87 (1962).

the entire thrust of the first report of the McClellan Committee is in support of the proposition that unions should be democratic. The views of Senator McClellan and his committee are particularly important as they had a substantial influence on the character of the LMRDA as it was finally enacted. The initial concern in Congress was primarily with financial abuses, but the amendments to the legislation reflected an increasing concern for union abuse of individual rights, resulting in a statute the central thrust of which was protection of union democracy. See Summers, American Legislation for Union Democracy, 25 Mod.L.Rev. 273, 274 (1962). This change was due in large part to the personal efforts of Senator McClellan, who for two years had presided over hearings involving corruption in the union movement. The first report of that committee thus constitutes a significant part of the legislative history, particularly since the original "bill of rights" was offered from the floor by Senator McClellan. That report listed a long string of abuses found in some unions, but it is significant that the perversion of union democracy stood at the top of the list. Interim Report of the Select Committee on Improper Activities in the Labor or Management Field, S.Rep. No. 1417, 85th Cong., 2d Sess. 4 (1958). It is even more noteworthy that in that committee's legislative recommendations it was said, Interim Report, supra, at 452:

> "Much that is elicited in the committee's findings of misconduct by union officials can be substantially improved, in the committee's view, by a revitalization of the democratic processes of labor unions."

21. It is perhaps not without irony that the defendants in this case urge that "freedom of speech exists only under law," citing Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131, but yet at the same time introduce a list of union offenses which is headed by the offense of "causing dissension among the members of the United Brotherhood."

22. See, also, Summers, Disciplinary Powers of Unions, 3 Ind. & Lab.Rel.Rev. 483

It is thus not surprising that the Court in Salzhandler showed little faith in the ability of a union tribunal to fairly weigh the delicate issues of a slander suit.[21] 316 F.2d at 449–450. The teaching of the McClellan hearings was that such tribunals had more than once been used to silence criticism by those who were overzealous in their desire to remain in power.[22] It was a further teaching of those sordid hearings that abuse of power inevitably led to the elimination of efficient, honest and democratic practices within the union. H.Rep. No. 741, 86th Cong., 1st Sess. 6 (1959), U.S.Code Congressional and Administrative News, p. 2318. It was plain to the Congress that the public had a vital interest in the internal affairs of unions which necessitated encouragement of the assertion of individual rights within the union despite strong arguments for strict regimentation of the union membership. See Summers, The Impact of Landrum-Griffin in State Courts, N.Y.U. 13th Annual Conf. on Labor 333 (1960). The respondents here, as in Salzhandler, present these arguments to this Court, but as the Second Circuit made clear, Congress has rejected these contentions. As the Court said, 316 F.2d at 451:

> "The union argues that there is a public interest in promoting the monolithic character of unions in their dealings with employers. But the Congress weighed this factor and decided that the desirability of protecting the democratic process within the unions outweighs any possible weakening of unions in their dealings with employers which may result from the freer expression of opinions within the unions."

(1950). In the author's conclusions as to the general characteristics of punishable offenses, it was said, 512–13:
> "It is clear that nearly all of the clauses are subject to abuse. * * * An accused member is apt to be convicted by the trial body for conduct which it believes undesirable rather than for conduct which the constitution makes punishable."

All of these considerations lend assistance to the narrow question at hand, and they all dictate that the statute must be construed to protect the petitioner here against the action taken against him in the name of a trial for slander. As the Court in Salzhandler said so well, 316 F.2d at 451:

"The democratic and free expression of opinion in any group necessarily develops disagreements and divergent opinions. Freedom of expression would be stifled if those in power could claim that any charges against them were libelous and then proceed to discipline those responsible on a finding that the charges were false."

Protection of the democratic process is one of the paramount purposes of the LMRDA, which leads this Court to feel that the substantive rights conferred by Section 101(a)(2) should be construed broadly and that the provisos should not readily be construed to abridge these substantive rights. The statement by Senator Kuchel [23] relied on by the respondents here is not only ambiguous; it is inconsistent with subsequent remarks by Senator Kuchel [24] dealing with the broad issue presented by this litigation. Most important, the interpretation of those former remarks which is urged here is totally inconsistent with the statute's strong theme of protection of the right of criticism. If any meaning is to be attributed to those remarks, it seems preferable to take them to mean that Section 101(a)(2) does not deprive an aggrieved union officer of his common law actions for libel or slander.

The facts in this motion for a preliminary injunction have not been developed by testimony, as the respondents may wish to do, but there seems little doubt as to the nature of the petitioner's remarks. Whether he asked a question (as he says) or made an accusation (as the respondents say), it is clear that he was concerned with the controversy involving Archie Anderson, who is currently running against the respondent Woida for the office of senior business agent of Local No. 7. Mr. Anderson has also had occasion to be a plaintiff in the Federal Court in this District. He was tried by the Carpenters' District Council for falsifying his application for union membership, acquitted, and subsequently retried by the International under its so-called investigatory powers. This Court takes notice of the fact that Judge Nordbye decided that Anderson did not get a fair trial in the latter proceeding. All of the oral argument on this motion was predicated on the assumption that the petitioner's remarks (whatever they were) concerned the Anderson controversy. There is nothing in the affidavits which suggests that Mr. Stark's remarks did not concern Mr. Woida's activities as a union officer. This being true, it seems that Salzhandler is in point and the petitioner is entitled to the relief sought.

■■ The petitioner may not have had a federal right to get answers to his charges, but he had a federal right to make those charges without fear of reprisal. It would seem that the statute's basic concern is not in what was said (i. e., the precise words) but rather with what was being talked about. If the underlying topic of conversation concerns union affairs, then arguments, questions or accusations relating thereto are protected.[25] The union member is not bound at his peril to present only carefully documented charges within the union hall. The statute contemplates questions in the union hall so that documented charges can perhaps be brought in the courts for any wrongdoing that might be uncovered. It seems patently clear that the LMRDA was designed to provide a more receptive attitude toward individual inquiry so that, inter alia, the union movement could clean up its own

23. See footnote 9, supra.

24. See footnote 17, supra.

25. What is said here is obviously based on the remarks made by the petitioner, which are extremely mild in comparison to the charges in the Salzhandler case.

house *or* so that corruption could be nipped in the bud. It is no defense to say that the affairs of the particular union are as pure as the driven snow. It is one of the sad teachings of the McClellan hearings that when questions are stifled and union democracy subverted, the honest union of today is in danger of becoming the corrupt union of tomorrow.

This Court is therefore of the opinion that the petitioner is entitled to a preliminary injunction on the pleadings and affidavits for the reason that the respondents infringed the petitioner's rights under Section 101(a)(2) of the LMRDA by subjecting him to a union trial for slander in the circumstances presented here. It follows that it does not matter whether the trial was conducted fairly within the meaning of Section 101(a)(5).