# LINN *v.* UNITED PLANT GUARD WORKERS OF AMERICA, LOCAL 114, ET AL.

No. 45.   Argued November 18, 1965.—Decided February 21, 1966.

54

*Donald F. Welday* argued the cause for petitioner. With him on the brief was *Donald F. Welday, Jr.*

*Winston L. Livïngston* argued the cause for respondents. With him on the brief were *Harold A. Cranefield* and *Nancy Jean Van Lopik.*

*Solicitor General Marshall* argued the cause for the United States, as *amicus curiae,* by special leave of Court,

urging reversal. With him on the brief were *Arnold Ordman, Dominick L. Manoli, Norton J. Come* and *Laurence S. Gold*.

*Paul L. Jaffe* filed a brief for Schnell Tool & Die Corp. et al., as *amici curiae*.

Mr. Justice Clark delivered the opinion of the Court.

The case before us presents the question whether, and to what extent, the National Labor Relations Act, as amended, 61 Stat. 136, 29 U. S. C. § 141 *et seq.* (1964 ed.), bars the maintenance of a civil action for libel instituted under state law by an official of an employer subject to the Act, seeking damages for defamatory statements published during a union organizing campaign by the union and its officers. The District Court dismissed the complaint on the ground that the National Labor Relations Board had exclusive jurisdiction over the subject matter. It held that such conduct "would arguably constitute an unfair labor practice under Section 8 (b)" of the Act and that *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), compelled a dismissal on pre-emption grounds. The Court of Appeals affirmed, 337 F. 2d 68, assuming without deciding that the statements in question were "false, malicious, clearly libelous and damaging to plaintiff Linn, albeit they were relevant to the union's campaign." At p. 69. We granted certiorari, 381 U. S. 923. We conclude that where either party to a labor dispute circulates false and defamatory statements during a union organizing campaign, the court does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice and injured him. The judgment is, therefore, reversed.

## I.

Petitioner Linn, an assistant general manager of Pinkerton's National Detective Agency, Inc., filed this

suit against the respondent union, two of its officers and a Pinkerton employee, Leo J. Doyle. The complaint alleged that, during a campaign to organize Pinkerton's employees in Detroit, the respondents had circulated among the employees leaflets which stated *inter alia:*

"(7) Now we find out that Pinkerton's has had a large volume of work in Saginaw they have had it for years.

"United Plant Guard Workers now has evidence

"A. That Pinkerton has 10 jobs in Saginaw, Michigan.

"B. Employing 52 men.

"C. Some of these jobs are 10 yrs. old!

"(8) Make you feel kind sick & foolish.

"(9) The men in Saginaw were deprived of their *right to vote* in three N. L. R. B. elections. Their names were not summitted [*sic*]. These guards were voted into the Union in 1959! These Pinkerton guards were *robbed* of pay increases. The Pinkerton manegers [*sic*] were *lying* to us—all the time the contract was in effect. No doubt the Saginaw men will file criminal charges. Somebody may go to Jail!"

The complaint further alleged that Linn was one of the managers referred to in the leaflet, and that the statements in the leaflet were "wholly false, defamatory and untrue" as respondents well knew. It did not allege any actual or special damage but prayed for the recovery of $1,000,000 on the ground that the accusations were libelous *per se.* Federal jurisdiction was based on diversity of citizenship.

All respondents, save Doyle, moved to dismiss, asserting that the subject matter was within the exclusive jurisdiction of the Board. The record indicates that prior to the institution of this action Pinkerton had filed unfair labor practice charges with the Regional Director

of the Board, alleging that the distribution of the leaflets, as well as other written material, had restrained and coerced Pinkerton's employees in the exercise of their § 7 rights, in violation of § 8 (b)(1)(A) of the Act. The Regional Director refused to issue a complaint. Finding that the leaflets were circulated by Doyle, who was "not an officer or member of the charged union, nor was there any evidence that he was acting as an agent of such union," he concluded that the union was not responsible for the distribution of the leaflets and that the charge was, therefore, "wholly without basis." This ruling was sustained by the General Counsel of the Board some two months after this suit was filed.

In an unpublished opinion the District Judge dismissed the complaint holding, as we have already noted, that even if the union were responsible for distributing the material the case was controlled by *Garmon, supra.* The Court of Appeals affirmed, limiting its holding "to a suit for libelous statements growing out of and relevant to a union's campaign to organize the employees of an employer subject to the National Labor Relations Act." At 72.

## II.

The question before us has been a recurring one in both state and federal tribunals,[1] involving the extent to which the National Labor Relations Act, as amended, supersedes state law with respect to libels published during labor disputes. Its resolution entails accommodation of the federal interest in uniform regulation of labor relations with the traditional concern and responsibility of the State to protect its citizens against defamatory

---

[1] *E. g., Brantley* v. *Devereaux,* 237 F. Supp. 156 (D. C. E. D. S. C. 1965); *Meyer* v. *Joint Council 53, Int'l Bro. of Teamsters,* 416 Pa. 401, 206 A. 2d 382, petition for cert. dismissed under Rule 60, 382 U. S. 897 (1965). *Blum* v. *International Assn. of Machinists,* 42 N. J. 389, 201 A. 2d 46 (1964).

attacks. The problem is aggravated by the fact that the law in many States presumes damages from the publication of certain statements characterized as actionable *per se.*[2] Labor disputes are ordinarily heated affairs; the language that is commonplace there might well .be deemed actionable *per se* in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language. *Cafeteria Union* v. *Angelos,* 320 U. S. 293, 295 (1943). It is therefore necessary to determine whether libel actions in such circumstances might interfere with the national labor policy.

Our task is rendered more difficult by the failure of the Congress to furnish precise guidance in either the language of the Act or its legislative history.[3] As Mr.

---

[2] We adopt this terminology to avoid confusion with the concept of libel *per se,* applied in many States simply to designate words whose defamatory nature appears without consideration of extrinsic facts. Although Linn's complaint alleges that the leaflets were "libelous per se," his failure to specify the manner in which their publication harmed him indicates that he meant to rely on the presumption of damages. Under our present holding Linn must show that he was injured by the circulation of the statements; this necessarily includes proof that the words had a defamatory meaning.

[3] The Congress has declared in the Act that employees have the right to self-organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activity for mutual aid and protection. § 7. In § 8 (a) Congress has made it an unfair labor practice for an employer to restrain or coerce employees in the exercise of § 7 rights. Likewise, § 8 (b) protects these rights against interference by a labor organization or its agents. And § 8 (c) provides that the expression of any views or opinions "shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." In addition, § 9 (c)(1) authorizes the

Justice Jackson said for a unanimous Court in *Garner* v. *Teamsters Union,* 346 U. S. 485, 488 (1953): "The . . . Act . . . leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible."

The Court has dealt with specific pre-emption problems arising under the National Labor Relations Act on many occasions, going back as far as *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740 (1942). However, in framing the pre-emption question before us we need look primarily to *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959). There in most meticulous language this Court spelled out the "extent to which the variegated laws of the several States are displaced by a single, uniform, national rule . . . ." At 241. The Court emphasized that it was for the Board and the Congress to define the "precise and closely limited demarcations that can be adequately fashioned only by legislation and administration," while "[o]ur task is confined to dealing with classes of situations." At 242. In this respect, the Court concluded that the States need not yield jurisdiction "where the activity regulated was a merely peripheral concern of the Labor Management Relations Act . . . [o]r where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." At 243–244. In short, as we said in *Plumbers' Union* v. *Borden,* 373 U. S. 690, 693–694 (1963):

> "[I]n the absence of an overriding state interest such as that involved in the maintenance of domestic

---

Board, under certain conditions, to conduct representation elections and certify the results thereof. Finally, § 10 grants the Board exclusive power to enforce the prohibitions of the Act.

peace, state courts must defer to the exclusive competence of the National Labor Relations Board in cases in which the activity that is the subject matter of the litigation is arguably subject to the protections of § 7 or the prohibitions of § 8 of the National Labor Relations Act. This relinquishment of state jurisdiction . . . is essential 'if the danger of state interference with national policy is to be averted,' . . . and is as necessary in a suit for damages as in a suit seeking equitable relief. Thus the first inquiry, in any case in which a claim of federal preemption is raised, must be whether the conduct called into question may reasonably be asserted to be subject to Labor Board cognizance."

We note that the Board has given frequent consideration to the type of statements circulated during labor controversies, and that it has allowed wide latitude to the competing parties.[4] It is clear that the Board does not "police or censor propaganda used in the elections it conducts, but rather leaves to the good sense of the voters the appraisal of such matters, and to opposing parties the task of correcting inaccurate and untruthful statements." *Stewart-Warner Corp.*, 102 N. L. R. B. 1153, 1158 (1953). It will set aside an election only where a material fact has been misrepresented in the representation campaign; opportunity for reply has been lacking; and the misrepresentation has had an impact on the free choice of the employees participating in the election. *Hollywood Ceramics Co.*, 140 N. L. R. B. 221, 223–224 (1962); *F. H. Snow Canning Co.*, 119 N. L. R. B. 714, 717–718 (1957). Likewise, in a number of cases, the Board has concluded that epithets such as "scab," "unfair," and "liar" are com-

---

[4] See Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv. L. Rev. 38, 66 (1964).

monplace in these struggles and not so indefensible as to remove them from the protection of § 7, even though the statements are erroneous and defame one of the parties to the dispute. Yet the Board indicated that its decisions would have been different had the statements been uttered with actual malice, "a deliberate intention to falsify" or "a malevolent desire to injure." *E. g., Bettcher Mfg. Corp.,* 76 N. L. R. B. 526 (1948); *Atlantic Towing Co.,* 75 N. L. R. B. 1169, 1170–1173 (1948). In sum, although the Board tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees, it does not interpret the Act as giving either party license to injure the other intentionally, by circulating defamatory or insulting material known to be false. See *Maryland Drydock Co. v. Labor Board,* 183 F. 2d 538 (C. A. 4th Cir. 1950). In such case the one issuing such material forfeits his protection under the Act. *Walls Manufacturing Co.,* 137 N. L. R. B. 1317, 1319 (1962).

In the light of these considerations it appears that the exercise of state jurisdiction here would be a "merely peripheral concern of the Labor Management Relations Act," provided it is limited to redressing libel issued with knowledge of its falsity, or with reckless disregard of whether it was true or false. Moreover, we believe that "an overriding state interest" in protecting its residents from malicious libels should be recognized in these circumstances. This conclusion is buttressed by our holding in *United Construction Workers* v. *Laburnum Construction Corp.,* 347 U. S. 656 (1954), where Mr. Justice Burton writing for the Court held:

> "To the extent . . . that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been

eliminated. The care we took in the *Garner* case to demonstrate the existing conflict between state and federal administrative remedies in that case was, itself, a recognition that if no conflict had existed, the state procedure would have survived." At 665.

In *United Automobile Workers* v. *Russell,* 356 U. S. 634 (1958), we again upheld state jurisdiction to entertain a compensatory and punitive damage action by an employee for malicious interference with his lawful occupation. In each of these cases the "type of conduct" involved, *i. e.,* "intimidation and threats of violence," affected such compelling state interests as to permit the exercise of state jurisdiction. *Garmon, supra,* at 248. We similarly conclude that a State's concern with redressing malicious libel is "so deeply rooted in local feeling and responsibility" that it fits within the exception specifically carved out by *Garmon.*

We acknowledge that the enactment of § 8 (c) manifests a congressional intent to encourage free debate on issues dividing labor and management.[5] And, as we stated in another context, cases involving speech are to be considered "against the background of a profound . . . commitment to the principle that debate . . . should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964). Such considerations likewise

---

[5] The wording of the statute indicates, however, that § 8 (c) was not designed to serve this interest by immunizing all statements made in the course of a labor controversy. Rather, § 8 (c) provides that the "expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." 61 Stat. 142 (1947), 29 U. S. C. § 158 (c) (1964 ed.). It is more likely that Congress adopted this section for a narrower purpose, *i. e.,* to prevent the Board from attributing anti-union

weigh heavily here; the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth. But it must be emphasized that malicious libel enjoys no constitutional protection in any context. After all, the labor movement has grown up and must assume ordinary responsibilities. The malicious utterance of defamatory statements in any form cannot be condoned, and unions should adopt procedures calculated to prevent such abuses.

## III.

Nor should the fact that defamation arises during a labor dispute give the Board exclusive jurisdiction to remedy its consequences. The malicious publication of libelous statements does not in and of itself constitute an unfair labor practice. While the Board might find that an employer or union violated § 8 by deliberately making false statements, or that the issuance of malicious statements during an organizing campaign had such a profound effect on the election as to require that it be set aside, it looks only to the coercive or misleading nature of the statements rather than their defamatory quality. The injury that the statement might cause to an individual's reputation—whether he be an employer or union official—has no relevance to the Board's function. Cf. *Amalgamated Utility Workers* v. *Consolidated Edison Co.*, 309 U. S. 261 (1940). The Board can award no damages, impose no penalty, or give any other relief to the defamed individual.

On the contrary, state remedies have been designed to compensate the victim and enable him to vindicate his

motive to an employer on the basis of his past statements. See H. R. Rep. No. 510, 80th Cong., 1st Sess., 45 (1947). Comparison with the express protection given union members to criticize the management of their unions and the conduct of their officers, 73 Stat. 523 (1959), 29 U. S. C. § 411 (a)(2) (1964 ed.), strengthens this interpretation of congressional intent.

reputation. The Board's lack of concern with the "personal" injury caused by malicious libel, together with its inability to provide redress to the maligned party, vitiates the ordinary arguments for pre-emption.[6] As stressed by THE CHIEF JUSTICE in his dissenting opinion in *Russell, supra:*

> "The unprovoked infliction of personal injuries during a period of labor unrest is neither to be expected nor to be justified, but economic loss inevitably attends work stoppages. Furthermore, damages for personal injuries may be assessed without regard to the merits of the labor controversy . . . ." At 649.

Judicial condemnation of the alleged attack on Linn's character would reflect no judgment upon the objectives of the union. It would not interfere with the Board's jurisdiction over the merits of the labor controversy.

But it has been insisted that not only would the threat of state libel suits dampen the ardor of labor debate and truncate the free discussion envisioned by the Act, but that such suits might be used as weapons of economic coercion. Moreover, in view of the propensity of juries to award excessive damages for defamation, the availability of libel actions may pose a threat to the stability of labor unions and smaller employers. In order that the recognition of legitimate state interests does not interfere with effective administration of national labor policy the possibility of such consequences must be minimized. We therefore limit the availability of state remedies for libel

---

[6] The fact that the Board has no authority to grant effective relief aggravates the State's concern since the refusal to redress an otherwise actionable wrong creates disrespect for the law and encourages the victim to take matters into his own hands. The function of libel suits in preventing violence has long been recognized. Developments in the Law—Defamation, 69 Harv. L. Rev. 875, 933 (1956). But as to criminal libel suits see *Garrison* v. *Louisiana,* 379 U. S. 64 (1964).

to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage.

The standards enunciated in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), are adopted by analogy, rather than under constitutional compulsion. We apply the malice test to effectuate the statutory design with respect to pre-emption. Construing the Act to permit recovery of damages in a state cause of action only for defamatory statements published with knowledge of their falsity or with reckless disregard of whether they were true or false guards against abuse of libel actions and unwarranted intrusion upon free discussion envisioned by the Act.

As we have pointed out, certain language characteristic of labor disputes may be held actionable *per se* in some state courts. These categories of libel have developed without specific reference to labor controversies. However, even in those jurisdictions, the amount of damages which may be recovered depends upon evidence as to the severity of the resulting harm. This is a salutary principle. We therefore hold that a complainant may not recover except upon proof of such harm, which may include general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatever form of harm would be recognized by state tort law.[7] The fact that courts are generally not in close contact with the pressures of labor disputes makes it especially necessary that this rule be followed. If the amount of damages awarded is exces-

---

[7] The Government, as *amicus curiae*, has urged us to go further. It would limit liability to "grave" defamations—those which accuse the defamed person of having engaged in criminal, homosexual, treasonable, or other infamous conduct. We cannot agree. This would impose artificial characterizations that would encroach too heavily upon state jurisdiction.

sive, it is the duty of the trial judge to require a remittitur or a new trial. Likewise, the defamed party must establish that he has suffered some sort of compensable harm as a prerequisite to the recovery of additional punitive damages.[8]

Since the complaint here does not make the specific allegations that we find necessary in such actions, leave should be given Linn on remand to amend his complaint, if he so desires, to meet these requirements. In the event of a new trial he, of course, bears the burden of proof of such allegations.

## IV.

Finally, it has been argued that permitting state action here would impinge upon national labor policy because the availability of a judicial remedy for malicious libel would cause employers and unions to spurn appropriate administrative sanctions for contemporaneous violations of the Act. We disagree. When the Board and state law frown upon the publication of malicious libel, albeit for different reasons, it may be expected that the injured party will request both administrative and judicial relief. The Board would not be ignored since its sanctions alone can adjust the equilibrium disturbed by an unfair labor practice. If a malicious libel contributed to union victory in a closely fought election, few employers would be satisfied with simply damages for "personal" injury caused by the defamation. An unsuccessful union would also seek to set the election results aside as the fruits of an employer's malicious libel. And a union may be expected to request similar relief for defamatory statements which contribute to the victory of a competing union.

---

[8] It should be noted that punitive damages were awarded in *Laburnum* and *Russell*. In both instances there was proof of compensatory injury resulting from the defendants' violence.

Nor would the courts and the Board act at cross purposes since, as we have seen, their policies would not be inconsistent.

As was said in *Garrison* v. *Louisiana,* 379 U. S. 64, 75: "[T]he use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." We believe that under the rules laid down here it can be appropriately redressed without curtailment of state libel remedies beyond the actual needs of national labor policy. However, if experience shows that a greater curtailment, even a total one, should be necessary to prevent impairment of that policy, the Court will be free to reconsider today's holding. We deal here not with a constitutional issue but solely with the degree to which state remedies have been pre-empted by the Act.

*Reversed and remanded.*

MR. JUSTICE BLACK, dissenting.

The Court holds that an individual participant on the employer's side of a labor dispute can sue the union for libel on account of charges made by the union in the heat of the dispute. By the same token I assume that under the Court's holding, individual labor union members now have the right to sue their employers when they say naughty things during labor disputes. This new Court-made law tosses a monkey wrench into the collective bargaining machinery Congress set up to try to settle labor disputes, and at the same time exalts the law of libel to an even higher level of importance in the regulation of day-to-day life in this country.

When Congress passed the National Labor Relations Act, it must have known, as almost all people do, that in labor disputes both sides are masters of the arts of

vilification, invective and exaggeration. In passing this law Congress indicated no purpose to try to purify the language of labor disputes or force the disputants to say nice things about one another. Nor do I believe Congress intended to leave participants free to sue one another for libel for insults they hurl at one another in the heat of battle. The object of the National Labor Relations Act was to bring about agreements by collective bargaining, not to add fuel to the fire by encouraging libel suits with their inevitable irritations and dispute-prolonging tendencies. Yet it is difficult to conceive of an element more certain to create irritations guaranteed to prevent fruitful collective bargaining discussions than the threat or presence of a large monetary judgment gained in a libel suit generating anger and a desire for vengeance on the part of one or the other of the bargaining parties. I think, therefore, that libel suits are not only "arguably" but inevitably in conflict with the basic purpose of the Act to settle disputes peaceably—not to aggravate them, but to end them. For this reason I would affirm the judgment of the two lower courts.

Moreover, we held in *Thornhill* v. *Alabama,* 310 U. S. 88, 102, that "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." Discussion is not free, however, within the meaning of our First Amendment, if that discussion may be penalized by judgments for damages in libel actions. See the concurring opinions of MR. JUSTICE DOUGLAS and myself in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, and *Garrison* v. *Louisiana,* 379 U. S. 64, and my opinion in *Rosenblatt* v. *Baer, post,* p. 94. It is rather strange for this Court to import its novel ideas on libel suits into the area of labor controversies where the effect is bound to

abridge the freedom of the parties to discuss their disputes and to settle them through peaceful negotiations. It is strange because one of the hopes of those responsible for modern collective bargaining was that peaceful settlements among the parties working by themselves under the aegis of federal law would be substituted for the old-time labor feuds too frequently accompanied by bitter strife and wasteful, dangerous conflicts verging on private war. Because libel suits in my judgment are inconsistent with both the Constitution of the United States and the policies of the Act, I dissent from the holding of the Court reversing the judgment below.

MR. JUSTICE FORTAS, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join, dissenting.

In my opinion, the Court's decision in the present case opens a major breach in the wall which has heretofore confined labor disputes to the area and weaponry defined by federal labor law, except where violence or intimidation is involved. By arming the disputants with the weapon of libel suits and the threat of punitive damages the Court jeopardizes the measure of stability painstakingly achieved in labor-management relations. It introduces a potentially disruptive device into the comprehensive structure created by Congress for resolving these disputes. In so doing, the Court not only sanctions an arrangement inconsistent with the intent of Congress, but, I think, departs from its own decisions narrowly limiting the occasions on which the disputants may, outside of the statutory framework, litigate issues arising in labor disputes.

In my judgment, the structure provided by Congress for the handling of labor-management controversies precludes any court from entertaining a libel suit between parties to a labor dispute or their agents where the allegedly defamatory statement is confined to matters

which are part of the fabric of the dispute. The present controversy is just such a case.

Petitioner Linn is an officer of the employer sought to be organized by respondent union. The allegedly defamatory statements, set out in the opinion of the Court, relate to management conduct during the course of the dispute. The leaflets in question allegedly accuse management of lying both to the NLRB and to employees in order to deprive some employees of their right to vote in NLRB elections and to certain pay increases.

As an illustration of the kind of hyperbole characteristic of labor-management strife, this "libel" is hardly incendiary. To the experienced eye, it is pale and anemic when compared with the rich and colorful charges freely exchanged in the heat of many labor disputes.[1]

In response to such a pallid "libel," the Court today holds that petitioner, perceiving himself the target of a purportedly false and defamatory statement, may sue the union and several of its officers for damages—so long as he pleads that the statement is defamatory, was made with malice, and caused some injury to him. Should he succeed in clearing the hurdles thus set in his path, he may recover not only compensation for his "injuries," but punitive or exemplary damages as well. These requirements that petitioner plead and prove both malice and special damages—arising from what I regard as the Court's well-founded concern that libel suits might otherwise "pose a threat to the stability of labor unions and smaller employers"—may be cold comfort to the potential defendant in a libel suit. "Malice," which the Court defines as a deliberate intention to falsify or a malevolent

---

[1] Compare, for example, the considerably more imaginative use of vituperation reflected in the allegedly defamatory statement in *United Steelworkers of America* v. *R. H. Bouligny, Inc.,* 382 U. S. 145. A description of the statement is found in Brief for Respondent, p. 2 (No. 19, O. T. 1965).

desire to injure, is, after all, a largely subjective standard, responsive to the ingenuity of trial counsel and the predilections of judge and jury. And "injury" resulting from words is not limited to tangible trauma. These requirements afford dubious defense on a battlefield from which the qualified umpire—the NLRB—has been removed. In a libel suit, the outcome is determined by standards alien to the subject matter of labor relations, by considerations which do not take into account the complex and subtle values that are at stake, and by a jury unfamiliar with the quality of rhetoric customary in labor disputes. The outcome, in fact, is more apt to reflect immediate community attitudes toward unionization than appreciation for the underlying, long-term perplexities of the interplay of management and labor in a democratic society.

Until today, the decisions of this Court have consistently held that the federal structure for resolving labor disputes may not be breached or encumbered by state remedies where the tortious conduct allegedly involved is either protected or prohibited by federal labor legislation, or even "arguably subject to" federal law [2]— and despite the inability of the NLRB to redress the pecuniary harm suffered by the victim. In *Garner* v. *Teamsters Union,* 346 U. S. 485, the Court held that state courts may not enjoin peaceful picketing where plaintiff's grievance is within the jurisdiction of the NLRB. In *Guss* v. *Utah Labor Board,* 353 U. S. 1, the Court held that even where the NLRB declines to exercise its conceded jurisdiction over a labor dispute "affecting commerce," a parallel remedy before a state board

[2] Suits to enforce collective bargaining agreements have been held to arise under 29 U. S. C. § 185 (a) (1964 ed.) and hence are not within the reach of the pre-emption doctrine. See *Smith* v. *Evening News Assn.,* 371 U. S. 195; Sovern, Section 301 and the Primary Jurisdiction of the NLRB, 76 Harv. L. Rev. 529 (1963).

is nonetheless pre-empted. And in *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, the Court concluded that state courts may not award damages for peaceful picketing, although the conduct involved was only "arguably subject" to the federal statute and despite the NLRB's decision not to exercise jurisdiction.[3] See also *Liner* v. *Jafco, Inc.*, 375 U. S. 301; *Plumbers' Union* v. *Borden*, 373 U. S. 690; *Local 438, Constr. Laborers* v. *Curry*, 371 U. S. 542. Today marks the first departure from what has become a well-established rule that only where the public's compelling interest in preventing violence or the threat of violence is involved can the exclusiveness of the federal structure for resolving labor disputes be breached. As was said in *Garmon*, 359 U. S., at 247: "Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme." The majority's opinion fails to make clear why the participant's interest in protecting his reputation from the sting of words uttered as part of a labor dispute is a compelling concern which this Court must allow the States to protect, while his interest in preserving his economic well-being from illegal picketing is not.

By narrowly restricting the permissible exceptions to the general rule of pre-emption and by excluding generally the right to compensation for purely private wrongs, the Court has contributed to the Nation's success in domesticating the potentially explosive warfare between labor and management. The decision announced today

---

[3] Subsequent to *Garmon* and *Guss,* Congress has explicitly removed the obstacles to state-court treatment of labor disputes as to which the NLRB has declined to exercise jurisdiction on the ground of insufficient effect on interstate commerce. 29 U. S. C. § 164 (c)(2) (1964 ed.).

threatens the degree of equilibrium which has been achieved. I think that the Court's decision both underestimates the damage libel suits may inflict on the equilibrium, and overestimates the effectiveness of the restraint which will result from superimposed requirements of malice and special damages.

I find support for my view in the evidence as to the intent of Congress. As the majority concedes, Congress has in unmistakable terms recognized the importance of labor-management dialogue untrammelled by fear of retribution for strong utterances. It has manifested awareness that lusty speech provides a useful safety valve for the tensions which often accompany these controversies. For example, Congress has provided that an unfair labor practice charge may not be based on the "expressing of any views, argument, or opinion . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U. S. C. § 158 (c) (1964 ed.).[4] And one of its statutes, 29 U. S. C. § 411 (a)(2) (1964 ed.), has been construed to prevent unions from disciplining members who utter defamatory statements during the course of internal union disputes. Salzhandler v. Caputo, 316 F. 2d 445 (C. A. 2d Cir.), cert. denied, 375 U. S. 946; Cole v. Hall, 339 F. 2d 881 (C. A. 2d Cir.); Stark v. Twin City Carpenters Dist. Council, 219 F. Supp. 528 (D. C. D. Minn.). Where Congress wishes to create an exception to the general rule of exclusive NLRB jurisdiction, it does so explicitly. See 29 U. S. C. § 187 (1964 ed.), authorizing suits for damages arising out of violations of

---

[4] Although libelous statements cannot serve as the predicate for an unfair labor practice charge, like any other misleading statement they may in certain circumstances induce the NLRB to set aside the results of an election. See Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv. L. Rev. 38, 82–84 (1964).

29 U. S. C. § 158, and 29 U. S. C. § 164, authorizing judicial remedies where the NLRB declines to assert jurisdiction under 29 U. S. C. § 151 (1964 ed.).

The foregoing considerations do not apply to the extent that the use of verbal weapons during labor disputes is not confined to any issue in the dispute, or involves a person who is neither party to nor agent of a party to the dispute. In such instances, perhaps the courts ought to be free to redress whatever private wrong has been suffered. But this is not such a case. The fact that the Court today rules that, after appropriate amendment of the complaint, a libel action may be maintained on the basis of the circumscribed accusation contained in the leaflet in question demonstrates how very substantial is the breach opened in the wall which has heretofore insulated labor disputes from the vagaries of lawsuits.[5] I would affirm the decision below.

---

[5] Resort to libel suits as an auxiliary weapon in resolving labor disputes presents much more than an abstract threat. For evidence of a growing tendency to invoke these suits see the list of such cases recently pending in the Fourth Circuit alone in Brief for Petitioner, p. 15, *United Steelworkers of America* v. *R. H. Bouligny, Inc., supra;* and those discussed at pp. 18–39 of the Appendix to the brief filed by respondents in Nos. 89 and 94, O. T. 1965, and in the present case as *amici curiae.*