## Richmond

OLD DOMINION BRANCH NO. 496, NATIONAL ASSOCIATION OF LETTER
CARRIERS, AFL-CIO AND THE NATIONAL ASSOCIATION OF LETTER
CARRIERS, AFL-CIO v. HENRY M. AUSTIN, L. D. BROWN
AND ROY P. ZIEGENGEIST.

November 27, 1972.

Record Nos. 7917, 7918 and 7919.

Present, l'Anson, Carrico, Harrison, Cochran, Harman and Poff, JJ.

*Mozart G. Ratner* [D.C.] *(Israel Steingold; Bernard Ries* [D.C.]; *Jerry D. Anker* [D.C.]; *Lichtman, Abeles & Anker* [D.C.], on brief), for plaintiffs in error in Record Nos. 7917, 7918 and 7919.

*Parker E. Cherry; Stephen M. Kapral (Purcell, Cherry & Kerns,* on brief), for defendants in error in Record Nos. 7917, 7918 and 7919.

I'ANSON, J., delivered the opinion of the court.

Defendants, Old Dominion Branch No. 496, National Association of Letter Carriers, AFL-CIO, and The National Association of Letter Carriers, AFL-CIO, are here on writs of error to three judgments entered against them on jury verdicts rendered in separate actions bought by the plaintiffs, Henry M. Austin, L. D. Brown, and Roy P. Ziegengeist, under Virginia's insulting words statute, Code § 8-630. The three cases were tried together and the jury awarded each plaintiff compensatory damages of $10,000 and punitive damages of $45,000.

Defendants contend (1) that Code § 8-630 is unconstitutional on its face; (2) that the doctrine of federal preemption precludes the State court from exercising jurisdiction in these cases; (3) that the publication complained of was constitutionally protected free speech under the First and Fourteenth Amendments to the Constitution of the United States; (4) that instruction No. 4 was erroneous; and (5) that the damages awarded were excessive.

The evidence shows the following: Defendants were duly recognized as the exclusive collective bargaining representatives for all letter carriers in the Richmond, Virginia, area. Dues were deducted by the post office accounting office from the union members' pay checks and forwarded to the national labor union's office, and the latter office sent the local "Branch" its share of the amount collected.

Plaintiffs Austin, Brown and Ziegengeist were employed as letter carriers by the United States Postal Service in Richmond, but they were not members of the union.

In several issues of "Carrier's Corner," a monthly newsletter published by the local Branch under the emblem of the National Association of Letter Carriers, the names of the letter carriers who had not joined the union were shown under the heading "List of Scabs." Plaintiff Austin complained to the president of the Branch and was

told that this was the method used to force non-union members to join the union.

The June 1970 issue of "Carrier's Corner" carried the "List of Scabs," which consisted of fifteen names, including those of the three plaintiffs. Immediately above this list the following appeared:

"The Scab

"Some co-workers are in a quandry as to what a scab is; we submit the following:

'After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which He made a scab.

'A scab is a two-legged animal with a corkscrew soul, a water brain, a combination backbone of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.

'When a scab comes down the street, men turn their backs and angels weep in Heaven, and the Devil shuts the gates of hell to keep him out.

'No man (or woman) has a right to scab so long as there is a pool of water to drown his carcass in, or a rope long enough to hang his body with. Judas was a gentleman compared with a scab. For betraying his Master, he had character enough to hang himself. A scab has not.

'Esau sold his birthright for a mess of pottage. Judas sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. The scab sells his birthright, country, his wife, his children and his fellowmen for an unfulfilled promise from his employer.

'Esau was a traitor to himself, Judas was a traitor to his God, Benedict Arnold was a traitor to his country; a SCAB is a traitor to his God, his country, his family and his class!' "

Copies of the June newsletter were distributed to members of the local union, and at least one copy was posted on the "station" bulletin board.

Plaintiff Austin testified that after the June article appeared some of his co-workers stopped speaking to him and otherwise manifested hostility toward him; that on two occasions at social gatherings he was referred to as the scab they were talking about; and that several months after the June publication he began having migraine headaches which were diagnosed by a physician to be the result of tension

and nervousness. Brown testified that the article made him upset and nervous; that he had headaches; that he had to work in a hostile atmosphere; and that his co-workers made jokes at his expense and called him names. Ziegengeist testified that he had enjoyed a good relationship with his co-workers, but after the article appeared they became cool toward him; that his wife was distraught; and that he was harassed by union representatives. His teen-aged daughter testified that the article had upset her mother and father, and they were all afraid that someone might come around the house and harm them.

Angelo Barker testified that he was "Secretary of the Association and editor of the paper." He said that the statement in the text complained of, that plaintiffs were traitors to their country, was made as a figure of speech, not based on fact, and that he could not say whether or not they were traitors. When cross-examined about other statements in the text he said that "Since the plaintiffs were getting the benefits of the union without joining, I think they have rotten principles." The plaintiffs "are in a sense being * * * leech[es] on these people they are associating with every day [and] I think it should be brought to light to the individuals they are associating with, what is going on."

█ Defendants contend that Code § 8-630 is unconstitutional on its face because it is vague and overbroad and infringes upon the right of free speech that is protected by the First and Fourteenth Amendments.

Code § 8-630 reads as follows:

"All words which from their usual construction and common acceptation are construed as insults and tend to violence and breach of the peace shall be actionable."

Defendants rely on the recent United States Supreme Court case of *Gooding* v. *Wilson*, 405 U.S. 518, 520-21, 526-28, 92 S.Ct. 1103, 1105, 1108-09, 31 L.Ed.2d 408, 413, 416-17 (1972). The Court held that the Georgia statute, providing that "Any person who shall, without provocation, use to or of another, and in his presence * * * opprobrious words or abusive language, tending to cause a breach of the peace * * * shall be guilty of a misdemeanor," was on its face unconstitutional, vague and overbroad under the First and Fourteenth Amendments because it had "not been narrowed by Georgia courts

to apply only to 'fighting' words which by their very utterance * * * tend to incite an immediate breach of peace," citing *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

In Virginia we have held that a civil action brought under Code § 8-630, the insulting words statute, is one for libel or slander and the common-law rules of slander are to be applied, even though the language used is defamatory on its face. *M. Rosenberg & Sons* v. *Craft*, 182 Va. 512, 528, 29 S.E.2d 375, 382-83 (1944); *Carwile* v. *Richmond Newspapers, Inc.*, 196 Va. 1, 6, 82 S.E.2d 588, 591 (1954); *Shupe* v. *Rose's Stores, Inc.*, 213 Va. 374, 192 S.E. 766 (1972), this day decided.

We have also held that a libelous statement, otherwise actionable, may not be so for the reason that the circumstances under which it was published confer upon the publisher a privilege to publish it. The basis for such privilege is the public interest in free expression and communication of ideas. Where this interest is sufficient to outweigh the interest of the State in protecting the individual plaintiff from damage to his reputation and social relationships, the law does not allow recovery of damages, compensatory or punitive, occasioned by defamatory speech or publication, unless there has been an abuse of the privilege by a showing that the defamatory language, either written or spoken, was made with actual malice. See *Story* v. *Newspapers*, 202 Va. 588, 591, 118 S.E.2d 668, 670 (1961); *Sanders* v. *Harris, et al.*, 213 Va. 369, 192 S.E.2d 754 (1972), this day decided.

Under our construction and limitations of Code § 8-630, only those words which are not protected by the First Amendment are actionable under the statute. Thus the objections of vagueness and overbreadth that were raised in *Gooding* are not applicable in this case.

■ Defendants contend that the doctrine of federal preemption precludes the State from imposing liability in these cases, since defendants' conduct falls within the area subject to exclusive federal regulation under Executive Order 11491.[1]

---

[1] At the time these cases arose, labor relations in the postal service were regulated by Executive Order 11491, rather than the National Labor Relations Act. Defendants conceded that the Executive Order is essentially equivalent to the Act in both content and purpose, and "is to be accorded the force and effect given the statute enacted by Congress." *Farkas* v. *Texas Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir., 1967), *cert. den.* 389 U.S. 977 (1967). The Postal Reorganization Act, P.L. 91-375, 84 Stat. 719, 39 U.S.C. § 101, *et seq.*, enacted August 12, 1970, left this Executive Order in effect until superseded by Chapter 12 thereof, which became effective on July 1, 1971. See 84 Stat. 787, § 15(a). Chapter 12 of PRA makes the National Labor Relations Act, in substance, applicable to the postal service.

The effect of Executive Order 11491, which is essentially equivalent in both content and purpose to the National Labor Relations Act, upon the jurisdiction of state courts to apply state law to an action against a labor union for the publication of libelous statements during a union organizational campaign was determined by the Supreme Court of the United States in *Linn* v. *United Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

A majority of the Court, through Mr. Justice Clark, in *Linn*, said:

"We conclude that where either party to a labor dispute circulates false and defamatory statements during a union organizing campaign, the court does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice and injured him." 383 U.S. at 55, 86 S.Ct. at 659, 15 L.Ed.2d at 583.

The majority of the Court also said:

"But it must be emphasized that malicious libel enjoys no constitutional protection in any context. After all, the labor movement has grown up and must assume ordinary responsibilities. The malicious utterance of defamatory statements in any form cannot be condoned, and unions should adopt procedures calculated to prevent such abuses." Id. 383 at 63, 86 S.Ct. at 663, 15 L.Ed.2d at 590.

"The malicious publication of libelous statements does not in and of itself constitute an unfair labor practice. * * * The Board [National Labor Relations Board] can award no damages, impose no penalty, or give any other relief to the defamed individual.

"On the contrary, state remedies have been designed to compensate the victim and enable him to vindicate his reputation." Id. 383 at 63-64, 86 S.Ct. at 663, 15 L.Ed.2d at 590.

Hence we hold that Executive Order 11491 has not preempted the state court from exercising jurisdiction in these cases.

Defendants contend that the publication in these cases constituted protected free speech under the First and Fourteenth Amendments to the Constitution of the United States and the doctrine of *New York Times* v. *Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d

686 (1964), in the absence of evidence of "convincing clarity" that the statement was factually false and made with the knowledge of its falsity or with reckless disregard of its truth or falsity.

Beginning with *New York Times*, the United States Supreme Court has considered the extent to which state libel laws have to yield to the constitutional protection of freedom of speech and of the press. *New York Times* held that before there can be a recovery of damages in a civil libel action instituted by a "public official" against a newspaper, the constitutional guarantees of freedom of speech and of the press require evidence of convincing clarity that the defamatory falsehood alleged as libel was made "with 'actual malice'—that is with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

The impact of the First Amendment upon state libel laws was broadened to include "public figures" in *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The plurality opinion in *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), expanded the *New York Times'* knowing-or-reckless-falsity standard to a state civil libel action brought not by a "public official" or a "public figure" but by a private individual for a defamatory falsehood uttered in a radio broadcast where the statement made concerned an issue of "public or general interest."

In *Rosenbloom* the Supreme Court noted that it "has not yet had occasion to consider the impact of the First Amendment on the application of state libel laws to libels where no issue of general or public interest is involved." 403 U.S. at 48, fn. 17, 91 S.Ct. at 1822, fn. 17, 29 L.Ed.2d at 315, fn. 17.

In the case at bar the plaintiffs had the right to decide for themselves whether they would join the union, under the provisions of Executive Order 11491 and Virginia's "right to work law," Code §§ 40.1-58 to 40.1-69. The fact that plaintiffs elected not to join the union was only a private matter and an issue of general or public interest was not involved.

Since plaintiffs were neither "public officials" nor "public figures" and whether or not they joined the union did not present an issue of public or general concern, we hold that *New York Times, Butts*, and *Rosenbloom* are not applicable in the cases at bar.

Thus Virginia law, which is applicable in these cases, only required plaintiffs to prove by a preponderance of the evidence that a defamatory publication was made with actual malice.

For words to be considered as defamatory and actionable it is not necessary that the defamation charge be in direct terms. It may be made by inference, implication, innuendo, or insinuation. *Carwile*, 196 Va. at 7, 82 S.E.2d at 591-92; *James* v. *Powell*, 154 Va. 96, 152 S.E. 539 (1930).

Here the text of the publication complained of conveyed to the reader that the plaintiffs were traitors and men of such low character and rotten principles that they should be despised by their fellow workers. Hence this was not a publication protected by the First Amendment.

Instruction No. 4, complained of, reads as follows:

"Under the facts and circumstances of these cases, the statements in question were made upon an occasion known in the law as privileged, and the defendants are not liable for making such statements unless the defendants have abused such privilege.

"Under these circumstances, the burden is upon each plaintiff to prove by a preponderance of the evidence that the defendant Old Dominion Branch 496, National Association of Letter Carriers AFL-CIO, which was acting as the agent of the defendant The National Association of Letter Carriers AFL-CIO, circulated defamatory statements in June of 1970 with actual malice and that such defamatory statements, if any, caused him damage. You may not award damages for statements made at other times or other occasions.

"The statements complained of herein are to be considered defamatory and libelous if the respective plaintiffs prove by a preponderance of the evidence that such statements were in words which from their usual construction and common acceptation are construed as insults and tend to violence and breach of the peace.

"In determining whether or not the language complained of is insulting and tends to violence and a breach of the peace, the words must be construed in the plain and popular sense in which the rest of the community would naturally understand them; that is, they are to be construed according to their usual construction and common acceptation under the circumstances of this case, that is, in a labor dispute.

"The term 'actual malice' is that conduct which shows in fact that at the time the words were printed they were actuated by some sinister or corrupt motive such as hatred, personal spite, ill will, or desire to injure the plaintiff; or that the communication was made with such gross indifference and recklessness as to amount to a wanton or willful disregard of the rights of the plaintiff.

"In this connection you are told, however, that mere words of abuse indicating that one party dislikes another or that he has a low opinion of him, without more, does not amount to defamation. A certain amount of vulgar name calling, indicating hostility or ill will, under certain circumstances is tolerated by the law.

"If you believe that each plaintiff has proven the above elements by a preponderance of the evidence, you shall find your verdict for the plaintiffs, or plaintiff as the case may be, against both defendants, and assess the damages in accordance with the instruction on damages.

"If the plaintiffs, or any one or more of the plaintiffs as the case may be, has failed to prove his case by a preponderance of the evidence, you shall find in favor of the defendants in such case or cases."

The record shows that defendants objected and saved their exceptions to the instruction only on the following grounds: that the preponderance of evidence standard of proof is not applicable here, because under federal law the burden was on the plaintiffs to prove by clear and convincing evidence that the publication was made with actual malice, that is, with knowledge of its falsity or with reckless disregard of whether it was true or false; and that there was no evidence upon which the court could instruct the jury that the local Branch was acting as the agent of the National Association.

Having held that the federal rules as to burden of proof and knowing-or-reckless-falsity standard enunciated in *New York Times* are not applicable in these cases, we reject defendants' contention that federal law, not Virginia law, should be applied in these cases.

■ Defendants' objection that the court erred in instructing the jury that the Branch was an agent of the National Association cannot be sustained. The evidence shows that an agency relationship existed between the Branch and the National Association. The publication was under the National Association's insignia, and it was published for the purpose of forcing plaintiffs to join the Branch and the

National Association. See *United Constr. Wkrs.* v. *Laburnum*, 194 Va. 872, 879-86, 75 S.E.2d 694, 700-704 (1953), *aff'd* 347 U.S. 656 (1954).

Lastly, defendants contend that the damages are excessive.

In *Linn, supra,* 383 U.S. at 65-66, 86 S.Ct. at 664-65, 15 L.Ed.2d at 591, the Court set out the items of damages that may be considered by a jury. There it was said:

> "We, therefore, hold that a complainant may not recover except upon proof of such harm which may include general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatever form of harm would be recognized by state tort law. * * * Likewise, the defamed party must establish that he has suffered some sort of compensable harm as a prerequisite to the recovery of additional punitive damages."

There is no fixed standard for measuring exemplary or punitive damages, and the amount of the award is largely a matter of discretion with the jury. *United Constr. Wkrs.* v. *Laburnum,* supra, 194 Va. at 895, 75 S.E.2d at 709.

We cannot say from the evidence presented that the amounts of the compensatory and punitive damages awarded plaintiffs were excessive.

For the reasons stated, the judgments are

*Affirmed.*