## Richmond

MARY K. SANDERS v. WILLIAM A. HARRIS, TIMES-WORLD CORPORA-
TION, A VIRGINIA CORPORATION AND TIMES-WORLD CORPORA-
TION, A FORMER VIRGINIA CORPORATION, NOW DISSOLVED.

November 27, 1972.

Record No. 7934.

Present, All the Justices.

*Evans B. Jessee; Arthur E. Smith,* for plaintiff in error.

*Frank B. Miller, III; William R. Rakes; Daniel S. Brown (Andrew
P. Miller, Attorney General; D. Patrick Lacy, Assistant Attorney
General; Carroll D. Rea; Sands, Anderson, Marks & Clarke; Gentry,
Locke, Rakes & Moore; Hazelgrove, Carr, Dickinson, Smith & Rea,*
on brief), for defendants in error.

I'ANSON, J., delivered the opinion of the court.

This action for libel and slander was instituted by Mary K. Sanders,
plaintiff, against William A. Harris; Times-World Corporation, a
Virginia corporation; and Times-World Corporation, a former Vir-
ginia corporation, now dissolved, to recover compensatory and puni-
tive damages. The case was tried to a jury, and at the conclusion
of plaintiff's evidence the trial court sustained a motion to strike
the evidence and entered summary judgment for the defendants.

Plaintiff has assigned numerous errors, but the dispositive question
is whether the trial court erred in entering summary judgment for
the defendants.

The evidence shows that in 1966 the plaintiff, Dr. Sanders, became associated with Virginia Western Community College as a professor of English and head of the department. Virginia Western, located at Roanoke, is a State institution. In May or June 1969 the college administration announced that the English department would be merged into the Division of Humanities, and that Dr. Robert E. Hiedemann, who held a teaching position in another college, would head the division. Dr. Sanders was rehired for the school year 1969-70 only as a professor of English.

Dr. Hiedemann arrived on the Virginia Western campus on or about July 1, 1969, and thereafter he had several meetings with Dr. Sanders, but he did not mention to her that the English department files in her office should be transferred to his office. On the morning of July 24, 1969, Dr. Sanders was scheduled to meet with Dr. Hiedemann, but she was unable to attend due to sickness in her home. In Dr. Sanders' absence, Dr. Hiedemann directed that the English department files be removed to his office. Dr. Sanders learned of the removal of the files from her office the same morning from some of her faculty colleagues.

Prior to this time there had been some friction between the college administration and a certain group of the faculty who had organized what was known as the Faculty Senate. Dr. Sanders was a member of this organization, which was not recognized by the college.

On the morning of August 26, 1969, Robert Wilkinson, a member of the faculty and then vice-chairman of the Faculty Senate, telephoned the Times-World Corporation office and asked John J. Chamberlain, a reporter for The World-News, to announce in the afternoon newspaper that a meeting of the Faculty Senate would be held that night. In response to an inquiry by Chamberlain concerning the purpose of the meeting, Wilkinson stated that salaries and class loads would be discussed as well as "the possible censuring of a member or members of the college administration * * * because of the illegal seizure of the English department files." Wilkinson declined to give Chamberlain further information concerning the seizure but referred him to Roy White, the Faculty Senate chairman, who also refused to enlighten Chamberlain on the matter. Chamberlain then attempted to contact Dr. H. H. Hopper, president of the college, who was out of town. He was referred to William A. Harris, who had come to the college a short time before as its public information officer.

Chamberlain discussed the matter with Harris, who told him that all he knew about the removal of the files was based on rumors. Harris attempted to dissuade him from printing the story. From their conversation, Chamberlain learned something about the background of the incident and asked Harris several times whether or not the files had been seized. Harris answered Chamberlain's questions with a question which Chamberlain took as an implication that Dr. Sanders had refused to turn the files over to Dr. Hiedemann.

Based on Chamberlain's conversation with Harris, there appeared in the afternoon issue of The World-News an article containing the following allegedly libelous statement:

"A college spokesman said that Dr. Hiedemann ordered the English Department files moved to his division when Dr. Sanders refused to turn them over to him."

Chamberlain attended a meeting of the Faculty Senate that night at which complaints were aired concerning the publication of the story, but no complaint was made as to its accuracy. Dr. Sanders had not seen the afternoon newspaper prior to her attendance at the meeting.

An article, with a slight change in terminology from the first one, was published the following afternoon. It stated that:

"A college spokesman said Hiedemann had the English Department files removed to his office after Dr. Sanders refused to turn them over to him."

Prior to the publication of the articles Dr. Sanders had not had any contact with the newspaper. Neither did Chamberlain nor any other employee of Times-World Corporation know Dr. Sanders or harbor any ill will, spite or grudge toward her at the time of the publication of the two articles.

Following the publications, considerable correspondence was exchanged between Dr. Sanders, Dr. Hopper, and various Times-World officials. Finally, after Dr. Sanders had been presented with a letter written by Dr. Hiedemann which stated that she had not refused to turn over the files, Times-World published an article correcting its previous misstatements.

Dr. Sanders' contract was not renewed by the college for the school year 1970-71. She alleged in her motion for judgment that

she had been unable to obtain employment with any other college because of the newspaper articles.

It was conceded by plaintiff's counsel in oral argument before us that the oral statements made by Harris and the newspaper articles were qualifiedly privileged. Plaintiff, by counsel, however, argues that the privileges had been abused; that Chamberlain should have ascertained the truth of the statements before publishing them; and that they were published in utter disregard of their truth or falsity.

Since it was conceded that the statements by Harris and their publication by the newspaper were qualifiedly privileged, before Dr. Sanders would be entitled to recover damages in this case the burden was on her to prove that the statements were made with actual malice. *Kroger Company* v. *Young*, 210 Va. 564, 569, 172 S.E.2d 720, 723 (1970); *Elder* v. *Holland*, 208 Va. 15, 23, 155 S.E.2d 369, 375 (1967); *Story* v. *Newspapers, Inc.*, 202 Va. 588, 590-91, 118 S.E.2d 668, 670 (1961).

In a series of cases beginning with *New York Times* v. *Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court of the United States has considered the limitations upon state libel laws imposed by the constitutional guarantees of freedom of speech and of the press. *New York Times* held, in a civil libel action by a "public official" against the newspaper, that those guarantees require clear and convincing proof that a defamatory falsehood alleged as libel was uttered with actual malice, that is, with the knowledge that it was false or with reckless disregard of whether it was false or not. The federal rule was later broadened to apply to "public figures" in *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the plurality opinion held that the *New York Times* doctrine applied to a libel action brought by a private individual against a radio station for the broadcasting of a statement concerning an issue of "public or general concern." There the court said:

> " '[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.' *St. Amant* v. *Thompson*, 390 U.S. 727, 732 [88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968)]. We thus hold that a libel action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public

or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." 403 U.S. at 51, 52, 91 S.Ct. at 1824, 29 L.Ed.2d at 316-17.

"[T]he negligence standard gives insufficient breathing space to First Amendment values." Id. at 52, 91 S.Ct. at 1824, 29 L.Ed.2d at 317.

The events and happenings at Western Community College were matters of "public or general concern." There is no evidence in this case from which the jury could conclude that the statements made by Harris to Chamberlain and the articles published by Times-World were made with actual malice or that they were made with reckless disregard of whether or not they were true.

We therefore hold that the trial court did not err in entering summary judgment for the defendants.

The judgment is

*Affirmed.*