Filed 7/24/24  Garcia v. Bowman CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| FRANZ CHRISTIAN GARCIA, | |
| Plaintiff and Respondent, | G063062 |
| v. | (Super. Ct. No. 30-2023-01319398) |
| JAKE BOWMAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Melissa R. McCormick, Judge. Affirmed.

Gilbert & Sackman, Joshua F. Young, Benjamin M. O'Donnell and Mitzi Marquez-Avila for Defendant and Appellant.

Theodora Oringher, Antony Buchignani, Adam Wentland and Lindley G. Round for Plaintiff and Respondent.

Jake Bowman appeals from the trial court's order denying his special motion to strike based on the anti-SLAPP statute. (Code Civ. Proc., § 425.16.)[1] He was sued for publishing allegedly defamatory social media posts that claimed his employer's animals were being abused by "the head horse trainer," coworker Franz Christian Garcia.

The trial court denied Bowman's motion, concluding that even though his publications were protected by the anti-SLAPP statute, Garcia had carried his burden to demonstrate a sufficient probability of success under the statute. We affirm.

FACTS[2]

I. *Context*

The parties were both employed by a company operating as "Medieval Times Dinner and Tournament" (company), which Garcia describes as "a family-friendly dinner theater featuring staged medieval-style games, sword-fighting, and jousting." The company operates multiple locations in different states, each called a "castle." At the California castle, a typical dinner show would "feature multiple horses performing in a variety of choreographed routines, including dancing, cantering, galloping, trotting, prancing, and jousting." At all relevant times, Garcia was employed there as

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

[2] Our factual summary is a compilation of complaint allegations, declarations, and other evidence submitted in support of the anti-SLAPP motion. (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 249.) For ease of reading, some capitalizations have been omitted from our quotations of the record.

a lead horse trainer and Bowman was employed as a knight, which he describes as "a job that required him to perform feats of horsemanship."

In November 2022, about four months before the social media posts at issue, the National Labor Relations Board (NLRB) certified the American Guild of Variety Artists (the union) as the collective bargaining representative for some of the company's employees, including knights like Bowman. One month later, Bowman was elected to act as the union steward and co-lead for the union's bargaining committee.

On February 11, 2023 (all further dates will refer to the year 2023), the union began a strike against the company. Around the same time, Bowman received a video recording of Garcia training a company horse named Opal (the Opal training session).

Bowman published different versions of the recording in March and April. As his counsel describes it, "at the time of [his] posts, [he] and his coworkers were on strike and the union was actively attempting to negotiate horse treatment with" the company.

It is undisputed that on March 22, an attorney for the union wrote to the company's counsel a letter containing the following subject line: "Stopping the ongoing abuse of horses by two trainers at the Buena Park castle of Medieval Times." Two days later, the company's counsel responded with a two-page letter asserting bad faith, as follows: "On February 15, 2023, the union provided a list of non-wage safety concerns.  The treatment of horses does not appear on that list. Now, for the first time, [the union] raises issues about the treatment of our horses. This fact alone suggests an ulterior motive and that [the union] has no real concern for the treatment of our horses."

The same day, March 24, Bowman commenced publishing five social media posts on three different platforms. Bowman states in his briefing that he did so "to place public pressure and force Medieval Times to take horse treatment and employee health and safety seriously." Specifically, between March 24 and April 2, Bowman published (among other communications) multiple videos depicting Garcia. In the post we focus on, Bowman referred to Garcia not by name but as "the head horse trainer . . . on site."

II. *The March 24 Social Media Post*

As we explain below, because of the way Bowman framed his motion underlying this appeal, we will focus on a social media post published on March 24. The post runs just under four minutes in duration and consists of multiple visual depictions. The first depiction is a headshot view of Bowman speaking with a logo behind him (saying "Medieval Times Performers") and, on the bottom right corner of the screen, his username.[3] He begins with the following introduction:

"Hello everyone, my name is Jake and I am a knight at Medieval Times in Buena Park. Unfortunately, I'm sitting on my couch right now instead of doing this:"

The post then shows 11 seconds of two combined video clips, with the same background music playing continuously. The first clip shows knights jousting on horses, and the second shows a knight being vanquished

---

[3] The username references only his account for the platform he published the post on, TikTok. In contrast, in some of his posts on a different platform, Bowman referenced his TikTok account.

4

in a mock sword fight. The clip then goes back to Bowman in front of the logo, for his following monologue:

"Last November we voted to unionize, uh, due to low pay, uh, health and safety concerns—the fact that they don't take very good care of us whenever we get hurt, and we get hurt all the time—uh, and now, hum, an issue that I want to bring to your attention which is unfortunately extremely sad and, and uh, not something that I necessarily wanted to . . . to post about, but something that we have to, which is animal abuse.

"Unfortunately, over the past year and a half of working at the current location, Medieval Times, I have witnessed multiple occasions of animal abuse from the head horse trainer and assistant head horse trainer on site. Uh, now, to clarify, I don't necessarily think that this is an issue at every single one of the castles, but it is an issue at the castle in California.

"Um, it's a situation in which we've brought up multiple instances of a trainer, uh, riding a horse too hard or using his spurs too much or whipping a horse repeatedly or using these standard tools that you would use in horse training, but using them excessively to the point where they're actually weapons. Um, we've brought that to management multiple times. We've been ignored, we've been shot down, um, and now I am here today to tell you about it and also to post at the end of this video, of it actually happening so, content warning ahead: If you are going to stay until the end of this video you are going to see, um, and hear a, uh, pretty rough instance of, of some horse abuse. Um, just to clarify a few things about this video: Um, obviously there-there, you know, spurs and whips and riding crops and different things like that are definitely tools that can be used for horse training. But, when they're used excessively, um, and too much, they become a weapon and not a tool and that's when it crosses the line into horse abuse.

"Uh, the reason that this is important outside of just the fact that we don't want our horses to be abused—we want them to be taken care of and treated very well—um, is that a stressed out horse and a horse that's been abused or a horse that's in a situation where, um, they are unhappy and they're trying to lash out because they're unhappy of something that's happening, um, that puts us in danger, right? That puts us in more danger than we already are, just the nature of our job. Um, and there've been multiple instances where a horse has been 'trained,'[4] um, right before we're supposed to get on them and that's caused a lot of issues with them trying to buck the riders off; our horses tend to kick and bite a lot more, um, than horses that I have experienced outside of this company.

"Uh, and it's just an, uh, unfortunate and sad situation that, um, we now need to get the public involved in, because we've been shut down repeatedly when we've talked to management. We've talked to management; we've talked to the CEO of the company—he doesn't care. We've even brought in animal control recently, um, in the Buena Park area, and they did a tour of the barn, found that the horses were being fed—which . . . they're not being fed enough in my opinion or at least they're not getting their proper, uh, vitamins and nutrition for, like, a high-performance horse—um, but irregardless, you know, they found that they were being fed and that the barn was relatively clean and because of that, they just sort of left so, here we are now and I'm going to show you this video and, um, you know, trigger warning ahead for horse abuse. Uh, I hope that you can help us get the word out and, um, hold the company accountable for everything that they've done."

---

[4] We use quotations marks here to denote our interpretation of Bowman's hand gesture during his pronunciation of the word as implying the word is not his, but attributable to some other speaker.

The visual of Bowman is then replaced by a one-second screenshot with a faint picture of a white horse in the background, with the following words written in white font: "CONTENT WARNING." The remaining 39 seconds of the post contain no words but whip-cracking sounds are repeatedly heard throughout a 30-second video of the Opal training session. The video is immediately followed by nine seconds of three pictures showing injuries to horses that are undisputedly *not* Opal, but not obviously so through the visuals. According to a declaration in the appellate record, the pictures (and a fourth picture that was not included in the post) were sent to Bowman by a coworker in connection with Garcia's training of horses other than Opal.[5]

III. *Garcia's Lawsuit and Bowman's Anti-SLAPP Motion*

Three weeks after Bowman's March 24 post, Garcia sued Bowman, alleging four causes of action: (1) defamation; (2) false light; (3) intentional infliction of emotional distress; and (4) negligence. Bowman responded with the underlying special motion to strike based on the anti-SLAPP statute, seeking to strike each of Garcia's causes of action, in their entirety. Both the motion and Garcia's opposition were accompanied by multiple declarations. Garcia objected to some of Bowman's declarations, but not news articles he attached to his declaration, claiming news media coverage of union organizing efforts beginning 11 months earlier. Among other issues, the parties disputed whether federal labor law was implicated by Garcia's defamation allegations.

---

[5] Garcia submitted a declaration by the company's veterinarian to support that no animal abuse was evidenced by the pictures.

The trial court overruled all of Garcia's evidentiary objections but denied Bowman's motion on the merits. The court agreed with the parties that Garcia's claims were based on activity protected by the anti-SLAPP statute, but concluded that Garcia had met his burden to demonstrate a sufficient probability of success for his causes of action, even after impliedly finding that federal labor law applied. Bowman timely appealed.

DISCUSSION

Bowman presents two main contentions about the trial court's denial of his anti-SLAPP motion: (1) the court erroneously concluded that Garcia sufficiently showed "'Bowman acted with actual malice,'" as required by federal labor law; and (2) Bowman's statements constitute nonactionable opinions. As discussed further below, because Bowman's March 24 post was not sufficiently connected to "union organizing efforts" (*Letter Carriers v. Austin* (1974) 418 U.S. 264, 279 (*Austin*)), we conclude the court reached the correct result.

I. *Standard of Review and Anti–SLAPP Principles*

Anti-SLAPP motions are "'intended to end meritless SLAPP suits early without great cost to the target' [citation], *not* to abort potentially meritorious claims due to a lack of discovery." (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 949.) "The procedure made available to defendants by the anti-SLAPP statute has a distinctive two-part structure. [Citations.] A court may strike a cause of action only if the cause of action [both] (1) arises from an act in furtherance of the right of petition or free speech 'in connection with a public issue,' and (2) the plaintiff has not established 'a probability' of prevailing on the claim. [Citation.]" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619-620.)

8

The California Supreme Court has "described th[e] second [part of anti-SLAPP analysis] as a 'summary-judgment-like procedure.' [Citation.]" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384-385.) The moving defendant "can prevail either by establishing a defense or the absence of a necessary element," but "[i]f there is a conflict in the evidence (the existence of a disputed material fact), the anti-SLAPP motion should be denied." (*Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 964-965.) The overall purpose of the second prong analysis is to determine "whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral, supra*, 1 Cal.5th at pp. 384-385.) A finding of sufficient merit for anti-SLAPP purposes has no evidentiary value for future trial court proceedings for the matter. (§ 425.16, subd. (b)(3).)

II. *Defamation and Federal Preemption Principles*

A libel cause of action cannot rest on a mere opinion; it requires a provably false fact. (*Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248.) Notwithstanding, there is no "wholesale defamation exemption for anything that might be labeled 'opinion'" and courts must endeavor to distinguish assertions of facts from protected "'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18, 20 (*Milkovich*).) To discern, we apply a "totality of the circumstances test." (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385.)

The essential elements of a defamation cause of action are (1) "a publication that is ([2]) false, ([3]) defamatory, ([4]) unprivileged, and ([5]) has a natural tendency to injure or causes special damage." (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720; see Civ. Code, §§ 44-46.) For defamation causes of action asserted by "private-figure plaintiffs," the standard of

9

liability that applies is based on negligence principles. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 741-742.) Above this baseline, some defamation defendants enjoy circumstance-specific defenses.

For example, starting with *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 (*New York Times*), the United States Supreme Court established that when the plaintiff is a "public figure," defendants should not incur defamation liability unless it is shown, by clear and convincing evidence (*Milkovich, supra*, 497 U.S. at p. 15), that defendants' statements were made with actual malice, which is defined as "statements published with knowledge of their falsity or with reckless disregard of whether they were true or false" (*Linn v. Plant Guard Workers* (1966) 383 U.S. 53, 65 (*Linn*); see *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 347, 349 [extending malice requirement to statements made in connection with issues of public concern, for presumed and punitive damages]).

Relevant to Bowman's contentions, the high court in *Linn, supra*, 383 U.S. at page 65, "adopted by analogy, rather than under constitutional compulsion," *New York Times's* actual malice rule to apply to defamatory conduct covered by the National Labor Relations Act (29 U.S.C. § 151 et seq.) (NLRA). Today, this *Linn* rule requires a plaintiff asserting defamation to prove, by clear and convincing evidence, actual malice (attributable to the defendant) and actual injury (suffered by the plaintiff) for "any publication made during the course of union organizing efforts, which is arguably relevant to that organizational activity." (*Austin, supra*, 418 U.S. at p. 279.)

III. *Analysis*

A. *Protected Activity*

We agree with the trial court and the parties that Garcia's claims at issue in Bowman's motion arise from activity protected by the anti-SLAPP

10

statute. (§ 425.16, subds. (e)(3) ["any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest"].) We therefore move to the second step of anti-SLAPP motion analysis.

B. *Probability of Prevailing*

The remainder of our independent review begins with the aim of Bowman's motion. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010 [central component of anti-SLAPP analysis is a "claim" which can be narrower than a cause of action].) Because the motion aims at Garcia's causes of action in their entirety, we now focus our analysis on Bowman's above-quoted March 24 post. It allows sufficient analysis of whether Garcia's four causes of action should have been struck in their entirety.

1. *Defamation Cause of Action*

a. *The* Linn *Rule*

Garcia argues that Bowman's publications should be subject to the baseline negligence standard of liability that applies to private-figure plaintiffs, not the *Linn* rule. Bowman disagrees, but we conclude he has not carried his burden to demonstrate that his asserted affirmative defense (see *Longshoremen v. Davis* (1986) 476 U.S. 380, 398-399) justifies striking any of Garcia's causes of action.

The *Linn* rule reflects "partial preemption of state libel law" (*Austin, supra*, 418 U.S. at p. 293) based on a balancing between federal labor policies and traditional state policy interests. The rule has a two-part trigger that requires, first, the existence of a "'labor dispute,'" as defined by the

11

NLRA,[6] and second, a sufficient connection between the dispute and allegedly defamatory publication at issue.

*Linn* and *Austin* remain authoritative guidance on what constitutes a sufficient connection. In *Linn*, an "assistant general manager" sued a "union, two of its officers and a[n] . . . employee" of the manager's employer because the employee had circulated leaflets "among the [employer's] employees" that claimed the manager (among others) had lied about "52 men" who worked for the same employer at a different location. (*Linn, supra*, 383 U.S. at pp. 55-57.) The allegedly defamatory communication claimed that the managers (including Linn) had lied about the existence of the men, meaning the 52 men "'were deprived of their right to vote in three N.L.R.B. elections.'" (*Id.* at p. 56.)

*Austin* involved a different factual context: the post-election phase of union organizing. (*Austin, supra*, 418 U.S. at pp. 266-267 [union had already been "recognized . . . as the exclusive local collective-bargaining representative" for the relevant unit of employees at issue].) There, three non-union employees sued a union after they were listed as "scabs" on the union's newsletters. (*Id.* at pp. 268-269.) A state supreme court affirmed a jury award of compensatory and punitive damages against the union, but the United States Supreme Court reversed. (*Id.* at pp. 270, 287.) The majority opinion's holding was that, because the label of "scab" amounted to nonactionable opinion, the plaintiffs had no cause of action for state court

---

[6] "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." (29 U.S.C. § 152(9).)

relief. (*Id.* at pp. 282-287.) That aspect of the case is not material to our analysis here.

What is relevant is that *Austin* elaborated on what qualifies as a sufficient connection between an NLRA labor dispute and allegedly libelous statements, for the purposes of triggering the *Linn* rule. The majority in *Austin* explained: "[W]e think that any publication made during the course of union organizing efforts, which is arguably relevant to that organizational activity, is entitled to the protection of *Linn*." (*Austin, supra*, 418 U.S. at p. 279; cf. *id.* at pp. 294-295 (dis. opn. of Powell, J.) ["federal labor law [was not] sufficiently implicated" by the facts presented "to warrant [partial] preemption of state libel law"].)

Garcia argues that "none of Bowman's social media posts are entitled to federal protection under the NLRA preemption doctrine described in *Linn* because" federal labor law is not sufficiently implicated. We agree with Garcia because the March 24 post at issue here is unlike the publications at issue in *Linn* and *Austin*.

In *Linn*, the alleged defamatory statements had been "circulated among the employees [of the company at issue there, through] leaflets." (*Linn, supra*, 383 U.S. at p. 56.) In *Austin*, the publication at issue had been communicated in a "union newsletter" (*Austin, supra*, 418 U.S. at p. 266) that was "distributed to members of the local union, and . . . posted on the 'station' bulletin board" (*Letter Carriers v. Austin, Et. Al.* (1972) 213 Va. 377, 379 [192 S.E.2d 737, 739], overruled by *Austin, supra*, 418 U.S. at p. 287). In contrast to the publications focused on company personnel in *Linn* and *Austin*, Bowman's March 24 post was intentionally unlimited in scope of intended audience. Moreover, in this matter, there is no assertion equivalent in nature to what was asserted in *Linn*, i.e., that elections governed by

13

federal labor law were wrongfully influenced by the conduct characterized in the allegedly defamatory communication. (*Linn, supra*, 383 U.S. at p. 56 [votes of 52 employees prevented for each of three elections].)

Based on the combination of the two contrasting aspects (nature of topic and intended audience), we conclude Bowman has not carried his burden to show a sufficient connection between his publication and an NLRA "labor dispute" that satisfied the second part of the trigger for the *Linn* rule. (See *Operating Engineers v. Jones* (1983) 460 U.S. 669, 676 [even where conduct is arguably protected or prohibited by NLRA, preemption analysis requires a "sensitive balancing of any harm to the regulatory scheme established by Congress, either in terms of negating the [NLRB]'s exclusive jurisdiction or in terms of conflicting substantive rules, and the importance of the asserted cause of action to the state as a protection to its citizens"].)

b. *Merits of Defamation Cause of Action*

Garcia carried his anti-SLAPP burden to show a sufficient probability of prevailing. (§ 425.16, subd. (b)(1).) He asserts that Bowman's March 24 post was "doctored" because the video of the Opal training session was immediately followed by pictures of different horses, without any explanation that they were different.[7] According to Garcia, by posting the sequence of visuals depicting injured horses, Bowman intended to give the audience an impression that the injuries were suffered by Opal and caused by Garcia's actions during the Opal training session.

---

[7] Garcia does not dispute he was connected to the other horses pictured, but his assertion that they are not Opal is not disputed by Bowman. It is also undisputed that even though Bowman received four pictures of injuries on different horses, he only included three of them for the March 24 post we analyze.

14

The argument is sufficient to show a trier of fact could render judgment in Garcia's favor. Given our conclusion that the *Linn* rule has not been triggered, we need not resolve Bowman's arguments about malice, such as his contentions that the trial court "fail[ed] to analyze evidence of Bowman's subjective state of mind" and erroneously considered the evidence on "actual malice in the light most favorable to Garcia."[8] Given our agreement that Garcia's theory of "doctored" visuals is sound, Bowman cannot show prejudice resulting from the court's assessment of the evidence that was presented for his motion.

c. *Nonactionable Opinion and Truth*

Bowman asserts that his statements in his March 24 post amounted to nonactionable opinions. (*Milkovich, supra*, 497 U.S. at p. 20; *Austin, supra*, 418 U.S. at p. 284.) We apply the "totality of the circumstances test" (*Overhill Farms, Inc. v. Lopez, supra*, 190 Cal.App.4th at p. 1261) and conclude Bowman's "assertion of [animal abuse], when viewed in th[e] specific factual context [presented by the record], is not merely a hyperbolic characterization of [the company's, and by extension Garcia]'s black . . .

---

[8] Notwithstanding, we note that Garcia's "doctored" argument for the March 24 post would be sufficient for anti-SLAPP analysis to show a trier of fact could render judgment in his favor under the *Linn* rule, because a trier of fact could find, by clear and convincing evidence, that Bowman fabricated a version of events that attempted to enhance credibility with knowledge of falsity. The undisputed nature of the material evidence would make it unnecessary for us to weigh in on a split of authority as to what degree of proof on malice should be met for anti-SLAPP analysis purposes. (Compare *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 86 [for anti-SLAPP analysis, "plaintiffs must demonstrate 'actual malice' by clear and convincing evidence"] with *Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 563 [sufficient to show "reasonable probability that" plaintiff "can produce clear and convincing evidence showing that the statements were made with actual malice"].)

15

heart—it represents an accusation of concrete, wrongful conduct." (*Id.* at p. 1262.)

Garcia has sufficiently shown that Bowman's published words, and their surrounding context, support a conclusion that he asserted facts to support his opinions. Indeed, Bowman's monologue was presented as a summarization of past events that included having "witnessed multiple occasions of animal abuse from the head horse trainer." The record shows no specialized knowledge or expectations attributable to Bowman's audience, i.e., the general public, that would have materially influenced how the communicated information would be received other than at face value, as factual matters.

Bowman also attempts to rely on the well-established principle that "[t]ruth, of course, is an absolute defense to any libel action." (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 581.) Garcia disagrees as to the truthfulness of Bowman's publication statements but additionally argues that the truth cannot assist Bowman because he in any case failed to disclose material facts connected to his statements. For example, on the Opal training session video, Garcia asserts the whip-cracking noise was the result of "a sound making device on the tip [of the whip] referred to as a 'popper'"[9] which Bowman failed to disclose despite his knowledge about the device.

---

[9] Garcia asserts "[t]he popper on the whip creates a snapping noise when cracking in the air directly behind the horse to provide auditory cues during the training session. This is the training method displayed in the [Opal training session] video."

16

Bowman counterargues that his nondisclosure about the "popper" did not change the character of his statements because it was factually true that Garcia's whip touched Opal in the video.[10] (See *Franklin v. Dynamic Details, Inc., supra*,116 Cal.App.4th at p. 387 [opinion nonactionable if underlying facts stated].) We need not decide the debate because it would not change our conclusion that, based on the objective information communicated by Bowman, Garcia has sufficiently demonstrated that Bowman's publication went beyond nonactionable opinions. (§ 425.16, subd. (b)(1).) Garcia carried his burden to show a reasonable probability of prevailing on the merits of his defamation cause of action.

2. *False Light Cause of Action*

For the second claim Bowman aims at, we adhere to the principle that "[w]hen a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action." (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1385, fn. 13; *Balla v. Hall* (2021) 59 Cal.App.5th 652, 687.) For the reasons just discussed with respect to Garcia's defamation cause of action, we conclude Garcia carried his

---

[10] Bowman asserts in the alternative that he sufficiently disclosed all necessary information to appropriately inform his audience about the bases for his opinions. As we noted earlier, Bowman's March 24 post that we focus on did not reference any other social media platform or username he used. The point negates Bowman's claim that when he published the pictures of horses that were not Opal, he disclosed facts about the difference through the following disclaimer: "Here are additional pictures of injuries from the overuse of a whip." His citation for the quote is to his post on a different platform, then known as Twitter, that was not referenced in any way in the March 24 post published on TikTok.

anti-SLAPP second prong burden to demonstrate sufficient probability of prevailing on his false light cause of action.

3. *Intentional Infliction of Emotional Distress Cause of Action*

Next, a "cause of action for intentional infliction of emotional distress exists when there is """(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.""" [Citations.] A defendant's conduct is 'outrageous' when it is so ""extreme as to exceed all bounds of that usually tolerated in a civilized community."" [Citation.] And the defendant's conduct must be ""intended to inflict injury or engaged in with the realization that injury will result."" [Citation.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051.)

We apply the above-discussed facts underlying Garcia's theory of "doctored" visual communication to the essential requirements of an intentional infliction of emotional distress cause of action. We conclude the facts on fabrication and resulting harm are sufficient, for anti-SLAPP analysis purposes, to demonstrate that a trier of fact could render judgment in Garcia's favor on the cause of action.[11] (§ 425.16, subd. (b)(3) [anti-SLAPP sufficient merit determination carries no future evidentiary value].)

_____

[11] Garcia asserts he suffered severe emotional distress that included not being able to work because of the distress, "difficulty sleeping, headaches, chest pains, and loss of appetite and weight." We reject Bowman's assertion that the facts and reasonable inferences from them are insufficient as a matter of law before discovery. (*Billauer v. Escobar-Eck, supra*, 88 Cal.App.5th at pp. 964-965.)

4. *Negligence Cause of Action*

Finally, we agree with Garcia that he has shown a sufficient probability of prevailing on his negligence cause of action. Garcia cites to the elements enumerated by CACI No. 400, which would instruct a jury to render a verdict in Garcia's favor if he shows: (1) "That [Bowman] was negligent"; (2) "That [Garcia] was harmed"; and (3) "That [Bowman]'s negligence was a substantial factor in causing [Garcia]'s harm."

Again, based on the facts underlying Garcia's theory of "doctored" visual communication, we conclude there is a sufficient probability that a jury could find all essential negligence elements shown. Bowman argues there is an insufficient probability of Garcia prevailing on a negligence theory, "for the same reasons" as his defamation, false light, and intentional infliction of emotional distress causes of action.

Because Bowman has not carried his burden to show his entitlement to an affirmative defense or the negation of an essential element for any of the preceding causes of action (*Baral v. Schnitt, supra*, 1 Cal.5th at pp. 384-385 ["'summary-judgment-like procedure'"]; see *Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 564-565 [shifting summary judgment burden of proof]), we are not persuaded by his argument on Garcia's negligence cause of action. In sum, we conclude the trial court reached the correct result in denying Bowman's special motion to strike Garcia's four causes of action in their entirety, Abased on the anti-SLAPP statute.

## DISPOSITION

The order denying Bowman's motion to strike pursuant to section 425.16 is affirmed. Respondent shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


O'LEARY, P. J.

WE CONCUR:


MOTOIKE, J.


GOODING, J.